FILED by ___ D.C.
ELECTRONIC

**June 19, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
## 09-CV-80918-MARRA-JOHNSON
CIVIL No.

MILLER'S ALE HOUSE, INC.

     Plaintiff,

vs.

BOYNTON CAROLINA ALE HOUSE, LLC.

     Defendant.

_____/

**PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
AND INCORPORATED
MEMORANDUM OF LAW**

Plaintiff moves this Court, pursuant to Fed. R. Civ. P. 65, for a preliminary injunction to enjoin Defendant's infringing use of Plaintiff's trademark and trade dress by Defendant's recently-opened Carolina Ale House in close proximity to Plaintiff's long-established Boynton Ale House and to end Defendant's deceptive coupon campaign, which has resulted in massive amounts of confusion in Florida, and states as follows:

## I.    BACKGROUND

Plaintiff is the owner of a well-known chain of more than 40 restaurants in Florida, which may be generally described as "sports bars". (Peterson Decl. ¶ 3)[1]  Plaintiff (through its predecessor) started in Jupiter, Palm Beach County, Florida, over 20 years ago and opened a restaurant in Boynton Beach, Palm Beach County, Florida, 18 years ago.  Since that time, and as discussed more fully below, Plaintiff has created a family of marks in relation to its chain of

_____

[1]    Exhibits 1-5, assignments of five of Plaintiff's Florida Trademark Registrations are annexed to the Complaint. Exhibit 6 is the Declaration of Kirk Humphreys filed with Plaintiff's current motion. Exhibit 7, annexed to Exhibit 6, is a license agreement between Defendant and LM Restaurants, Inc.  Exhibit 8 is the Declaration of Mark Peterson with Exhibits 9 and 10 annexed, Exhibit 11 is the Declaration of Mitchell Koenig with Exhibits 12-14 annexed, Exhibit 15 is the Declaration of Michael Karaban, and Exhibit 16 is the copyright application for Registration No. VAu000434206.

31275

restaurants. Through long, continuous and substantially exclusive use, these marks have come to be recognized by the relevant public as identifying the Plaintiff's restaurants and distinguishing Plaintiff's goods and services from those of its competitors. Each of the Plaintiff's marks comprising its family of marks consists of the term "Ale House" preceded by a geographic prefix, *e.g.*, JUPITER ALE HOUSE, BOYNTON ALE HOUSE, BOCA ALE HOUSE, etc. (hereinafter collectively referred to as "Plaintiff's Marks" or "Plaintiff's Family of Marks").

Defendant, with full knowledge of Plaintiff's 20-year history in Florida and Plaintiff's Family of Marks, opened a competing sports bar under the name "Carolina Ale House" a little over a mile from Plaintiff's Boynton Ale House and on the same street where the Boynton Ale House has been continuously operated for eighteen (18) years. (Koenig Decl. ¶ 30) Defendant has since flooded the market with coupons calculated to suggest that the Carolina Ale House is one of the Plaintiff's chain of restaurants. Further, Defendant has copied Plaintiff's trade dress and sought to trade on the goodwill developed in Plaintiff's Marks.

As was inevitable, massive confusion occurred and continues to occur, prompting Plaintiff to bring a state court action against Defendant in December 2008 for trademark infringement and unfair competition under Florida common law based on eight months of actual confusion. (Koenig Decl. ¶ 12) In response, (a) Defendant's licensor, LM Restaurants, Inc. ("LMR") brought suit in the U.S. District Court for the Eastern District of North Carolina ("E.D.N.C.") seeking to enjoin the Florida state court action and (b) Defendant thereafter filed various dilatory motions in the Plaintiff's state court action. As of the filing of the Complaint in this matter, the E.D.N.C. has not ruled on LMR's frivolous motion.

Examination of Defendant's premises has created the need for a copyright claim (exclusive federal jurisdiction) and rather, than continue to see justice delayed by Defendant's

dilatory tactics, Plaintiff has elected to voluntarily dismiss its state court action and consolidate its claims in this action.

In light of recent developments, the reasons for Defendant's persistent dilatory tactics and LMR's forum shopping are even more apparent. In April 2009, LMR disclosed in the North Carolina suit a copy of its license agreement with the Defendant in this case, which includes a "No Compete" agreement under which LMR required and Defendant agreed that (1) Defendant would not open a restaurant within fifty (50) miles of an LRM restaurant for a period of not less than five years, and (2) that Defendant would not adopt a business name or trademark containing the term "Ale House" for a period of not less than ten years. (Exhibit 7)

This is significant because LMR has operated a restaurant in North Carolina under the name "Carolina Ale House", which like Plaintiff's Marks is comprised of a geographic prefix and the term "Ale House". It seems evident from the "No Compete" agreement that Defendant and LMR recognized that Defendant's opening of a sports bar under a name including "Ale House" within even 50 miles of LMR's " Carolina Ale House" would result in actual confusion and cause serious and arguably irreparable injury to LMR.

Nevertheless, Defendant, with full knowledge of these facts, and apparently with LRM's tacit support if not outright encouragement, elected to open a "Carolina Ale House" in Boynton Beach, Florida, on the same street and approximately a mile from where Plaintiff's Boynton Ale House has operated for eighteen (18) years. As demonstrated more fully below, the Defendant's choice of location was deliberate, and the irreparable injury visited on Plaintiff by Defendant's unlawful conduct was clearly foreseeable to and intended by the Defendant.

## II.   RELEVANT FACTS

### A.   Plaintiff and Its Trademarks and Trade Dress

Plaintiff, a Delaware corporation, opened its JUPITER ALE HOUSE restaurant in Jupiter, Florida, in 1988, over 20 years ago. (Peterson Decl. ¶ 7) Plaintiff opened its BOYNTON ALE HOUSE restaurant in Boynton Beach, Florida, over 18 years ago. (Koenig Decl. ¶ 30) Today, Plaintiff owns and operates a chain of 47 restaurants of the genre known as "sports bars". (Peterson Decl. ¶¶ 7-9, 13)[2] The term "sports bar" generally refers to restaurants which have numerous television monitors displaying various sporting events, the display of sports memorabilia, and various appetizer and food offerings as well as beverages. (Koenig Decl. ¶ 9) For its restaurants in Palm Beach County, Plaintiff uses the marks BOYNTON ALE HOUSE (in Boynton Beach); JUPITER ALE HOUSE (in Jupiter); GARDENS ALE HOUSE (in Palm Beach Gardens); BOCA ALE HOUSE (in Boca Raton), and recently EAST BOCA ALE HOUSE (in Boca Raton).[3]

Plaintiff uses the trademarks associated with its sports bars consistently. For example, on buildings where Plaintiff's sports bars are located, *e.g.*, Boynton Beach, the sign on the building is BOYNTON ALE HOUSE. (Peterson Decl. ¶ 11).[4] Plaintiff separately uses a MILLER'S ALE HOUSE logo on its printed documents such as menus and business cards. (*Id.* ¶ 7) In the logo, the ALE HOUSE element that is common to Plaintiff's Family of Marks is in large font

---

[2]     Plaintiff owns and operates five restaurants in Palm Beach County, Florida, 37 other restaurants throughout Florida, and five restaurants outside of Florida. (Peterson Decl. ¶¶ 8, 9, 13)
        Plaintiff's menu is typical of what would be expected to be found in a sports bar, namely, appetizers in the $6 to $10 price range, soups and salads in the $3 to $10 price range, sandwiches including burgers in the $6 to $9 price range, other main courses such as steaks and seafood in the $ 9 to $16 price range, and beverages including soft drinks and beer. (Koenig Decl. ¶ 9) Plaintiff's chain of sports bars offer 27 varieties of draft beer but only two varieties of draft ales, and 28 varieties of bottled beer but no bottled ales. (Koenig Decl. ¶ 10)
[3]     These geographic prefixes are either the actual geographical name of the municipality or a suggestive name such as "Boynton" instead of Boynton Beach.
        Plaintiff's restaurants in Florida include locations not only in Palm Beach County but also in Ft. Lauderdale, Davie, Coral Springs, Hollywood, Jensen Beach, Miami, Orlando, Ocala, Sanford, Daytona, Gainesville, Jacksonville, Pensacola, Tallahassee, Brandon, Ft. Myers, Lakeland, Naples, Sarasota, St. Petersburg and Tampa. (Peterson Decl. ¶ 9) For each of these restaurants, Plaintiff has continued the theme of using a business name and corresponding mark consisting of a geographic prefix with the term "Ale House".
[4]     In the case of the Boynton Ale House, only the words ALE HOUSE are visible when the exterior of the restaurant is viewed from certain angles. (*Id.* at ¶ 12)

4

and is preceded by the word "Miller's" in smaller font. (*Id.*) Plaintiff has take-out or "to-go" menus which list all 47 locations. (Peterson Decl. ¶13)   Various menu items such as burgers are identified as "Ale House", *e.g.*, "Ale House Mini Burgers". (*Id.*; Karaban Decl. ¶ 25) This advertising and publicity makes Plaintiff's Family of Marks famous throughout at least the State of Florida. (Karaban Decl. ¶ 27)[5]

As a result of advertising, promotion, and quality of food and service, Plaintiff has established a substantial positive reputation not only in Palm Beach County, but throughout the State of Florida and consumers have come to know the Plaintiff's Marks as indicating a chain or family of high quality sports bar-type restaurants. (Karaban Decl. ¶ 27)

In addition to the Plaintiff's well-known Family of Marks, Plaintiff has developed a uniform and unique overall visual appearance or impression for its sports bars including such things as (a) the ALE HOUSE element of the Plaintiff's Family of Marks shown in red lettering on the outside of the buildings; (b) the ALE HOUSE element of the Plaintiff's Marks shown in red and yellow lettering on printed media; (c) a logo on printed media such as menus in which the ALE HOUSE element of the Plaintiff's Marks is shown in large type; (d) the use of the ALE HOUSE element of Plaintiff's Marks to identify specific menu items; (e) the apparel or uniforms worn by the servers, *e.g.*, dark polo-type top and khaki bottoms (shorts, slacks or skirt); (f) the peninsula or U-shaped bar; (g) the open kitchen; and (h) the location of high-top tables. (Koenig Decl. ¶ 10) This trade dress is used consistently throughout Plaintiff's restaurants and is arbitrary for a sports bar, meaning, that different colors could be used, a different shaped bar could be provided, different color combinations could be used for the servers uniforms, etc., and thus each

---

[5]      Plaintiff has undertaken a substantial effort to make its Family of Marks known throughout Florida and elsewhere including printed media advertising, coupons, and internet advertising (www.millersalehouse.com). (Peterson Decl. ¶ 14)  Plaintiff has also sponsored numerous local organizations and events, including community sports teams, public schools, and charitable events. (*Id.* at ¶ 15)

is non-functional (Karaban Decl. ¶ 34; Koenig Decl. ¶ 10)

In addition to the Plaintiff's long, continuous and substantially exclusive use of Plaintiff's Family of Marks in Palm Beach County and throughout Florida, the Plaintiff has secured a number of Florida State Trademark Registrations.[6]

## B.    Defendant and its Infringing Activities

Defendant opened its Carolina Ale House sports bar in the second quarter of 2008, on Congress Avenue in Boynton Beach, Palm Beach County, Florida just over one mile from and on the same street as Plaintiff's BOYNTON ALE HOUSE sports bar. (Peterson Decl. ¶ 18; Koenig Decl. ¶ 31). Defendant has blatantly copied the approach of Plaintiff's Family of Marks.[7] In Defendant's logo, ALE HOUSE predominates and is preceded by the word "Carolina" in substantially smaller type. (Id.; Peterson Decl. ¶ 4; Karaban Decl. ¶¶ 23, 30) The sign on the building is "Carolina" ALE HOUSE, using the approach of the Plaintiff's Family of Marks, although the prefix "Carolina" is in smaller type. (Peterson Decl. ¶ 11; Karaban Decl. ¶ 33)

As part of its effort to copy from Plaintiff, ten of Defendant's menu items are identified as "Ale House", e.g., "Ale House Chili Nachos", "Ale House Blackened Cheeseburger", "Ale House Chili Cheddar Cheeseburger", "Ale House Salad". (Karaban Decl. ¶ 25) Defendant's menu is also typical of what would be expected to be found in a sports bar, with menu items and

---

[6]      Plaintiff's Registrations include MILLER'S ALE HOUSE (Trademark Registration T02000001136), JUPITER ALE HOUSE AND RAW BAR AND DESIGN (Trademark Registration T14907), BOYNTON ALE HOUSE AND RAW BAR AND DESIGN (Trademark Registration T14909), BOCA ALE HOUSE AND RAW BAR AND DESIGN (Trademark Registration T94000001388), and ALE HOUSE AND RAW BAR AND DESIGN (Trademark Registration T15005), all of which were registered prior to 2008. (Exhibits 1-5; Peterson Decl. ¶ 29)
         Plaintiff has also filed for Florida State Trademark Registrations for additional trademarks following the same format: Boca East Ale House, Boca West Ale House, Coral Springs Ale House, Davie Ale House, Doral Ale House, Ft. Lauderdale Ale House, Gardens Ale House, Hollywood Ale House, Jensen Ale House, Kendall Ale House, North Miami Ale House and Pines Ale House. (Peterson Decl. ¶ 30)
[7]      Defendant's restaurant offers 36 varieties of draft beer but only three varieties of draft ales, and 37 varieties of bottled beer but no bottled ales. (Karaban Decl. ¶ 26) Thus, Defendant's motive in selecting ALE HOUSE can certainly not be attributed to any vast selection of ales. Of course, Plaintiff's motive in selecting ALE HOUSE was also not attributed to any vast selection of ales, leading to the conclusion that Plaintiff's choice was arbitrary and therefore protectable.

prices comparable to Plaintiff's menu items and prices. (Karaban Decl. ¶ 22)  Defendant's customers also are generally from college age to senior citizens, who watch televised sporting events, accompany those watching televised sporting events, or seek food and/or drink typical of a sports bar. (*Id.*)

Defendant further has copied Plaintiff's overall trade dress for its sports bar including such things as (a) the use of the term ALE HOUSE in red lettering on the outside of the buildings; (b)  the term ALE HOUSE in red lettering on printed media; (c) a logo on printed media such as menus in which only the term ALE HOUSE is shown  in large type; (d) the use of the term ALE HOUSE to identify specific menu items; [8] (e) the apparel or uniforms worn by the servers, *e.g.*, dark polo-type top and khaki bottoms (shorts, slacks or skirt); (f) the peninsula or U-shaped bar; (g) the open kitchen; and (h) the location of high-top tables. (Karaban Decl. ¶ 33)[9] The overall visual appearance, impression and image presented at Defendant's location is confusingly similar and communicates the same overall impression to an average reasonable consumer as the visual impression, image and appearance at Plaintiff's locations. (*Id.*)

Defendant deliberately has sought to trade on the goodwill developed in the Plaintiff's Family of Marks based on the confusing similarity that "Carolina Ale House" bears to Plaintiff's Marks.   To that end, Defendant has been issuing coupons through advertising in Florida providing a price discount for meals and drinks which coupon states that it is "VALID AT PARTICIPATING PALM BEACH AREA LOCATIONS." (Koenig Decl. ¶ 18; Exhibit 14).  The language on the coupon is designed to convey the false impression that Defendant's sports bar is part of the chain of sports bars that Plaintiff operates in the Palm Beach County area under its

---

[8]    "Ale House Mini Burger" was used by Plaintiff's predecessor before Defendant's licensor commenced business and is being infringed by Defendant's Ale House Burger marks. This mark is applied to burgers and there is no possible issue of genericness.

[9]    In fact, Plaintiff's overall layout appears to have been copied. (Peterson Decl. ¶ 31)

Family of Marks, thus misleadingly suggesting an affiliation between Defendant and Plaintiff. (*Id.*) Defendant obviously is aware that it has only a single location in the Palm Beach County area, and knows that Plaintiff that has multiple locations in the Palm Beach County area, including the BOYNTON ALE HOUSE, in operation for eighteen (18) years, which Defendant conveniently chose to open its location approximately a mile away from and on the same street. (Peterson Decl. ¶ 8; Koenig Decl. ¶¶ 30-31)  Defendant has even copied Plaintiff's promotional scheme to compound this source confusion.  For example, when Plaintiff started *Ladies Drink Free on Thursday Nights* in about April of 2008, Defendant opportunistically began offering the same promotion on Thursday nights approximately one month later.  (Koening Decl. ¶ 34) Furthermore, late last year Plaintiff learned that persons connected with the Carolina Ale House planned to open another Carolina Ale House location approximately one mile from Plaintiff's DAVIE ALE HOUSE restaurant.  (Peterson Decl. ¶ 4)

C.     **Defendant Is Aware of the Foreseeable Harm to Plaintiff and the Public Caused by the Defendant's Use of a Confusingly Similar Mark**

Defendant clearly is on notice of the confusing similarity of its mark and the gravity of the foreseeable harm visited on Plaintiff by Defendant's infringing use of its mark.  As discussed above, in Defendant's license agreement with LMR, Defendant agreed that it would not use the term "ALE HOUSE" in any trademark, brand, or good or service description for ten (10) years after the termination date" of the license agreement.  Defendant's licensor LMR was so concerned about the resulting confusion that it even sought to exclude Defendant from opening a competing business within 50 miles of any of LMR's locations. (Exhibit 7 at ¶ 17.2).

Yet Defendant had no compunction in using the term "ALE HOUSE" in opening a sports bar scarcely a mile away from Plaintiff's BOYNTON ALE HOUSE sports bar, and in adopting a mark that copies the format of Plaintiff's well-known Family of Marks, despite the foreseeable

8

harm (a harm that Defendant has agreed not to inflict on its licensor LMR).  Further, Defendant's coupons falsely suggest an association or affiliation with Plaintiff.

### D.    Defendant's Infringement Causes Harm to Plaintiff and the Public

#### 1.    Loss of Revenue

In 2008, consistent with the economic downturn in the United States, there was a general downturn in the total revenue generated at Plaintiff's family of sports bars.  (Peterson Decl. ¶ 20) In general, most of Plaintiff's sports bars experienced a decline in the single-digit range.  *Id.* Plaintiff's BOYNTON ALE HOUSE sports bar experienced a similar decline each month until May 2008, when the reduction in revenue dramatically increased to double digits (mid to upper teens).  (*Id.*)  The monthly decrease in revenue at that restaurant between May 2008 and December 2008 was between 11% and 19% from prior year's revenue, which is significantly out of step with the mostly single digit revenue declines at Plaintiff's other sports bars during the same period.  (*Id.*)  The steep drop-off in Plaintiff's revenue from its Boynton Beach location coincides with Defendant opening its Carolina Ale House in Boynton Beach, in the second quarter of 2008.[10]  (*Id.*)

Plaintiff's sales at its Boynton location, after adjustment for the effect of the economy, dropped 14% due to consumer confusion regarding Plaintiff's restaurant and Defendant's restaurant during the third quarter of 2008 when compared to the same period in 2007 (Peterson Decl. ¶ 20); the sales dropped 15.4% due to confusion as between Plaintiff's restaurant and Defendant's restaurant during the fourth quarter of 2008 when compared to the same period in 2007 (*Id.* at ¶ 21).  The methodology employed by Plaintiff to account for the impact of the economy is an acceptable approach. (Karaban Decl. ¶ 38)  Thus, Defendant's actions in Florida

---

[10]    While other restaurants have opened near Plaintiff's Boynton Ale House restaurant around the time Carolina Ale House opened in Boynton Beach, none of these restaurants are sports bars or use Plaintiff's Marks. (Koenig Decl. ¶ 33).

have had a direct and substantial adverse impact on Plaintiff's revenues.

### 2. Actual Confusion - Vendors

Since Defendant has operated its restaurant in Boynton Beach there have been repeated instances of actual confusion among vendors, specifically (a) an attempted delivery of Defendant's beer order to Plaintiff by a company (Gold Coast Beverage) which delivers to both Plaintiff's BOYNTON ALE HOUSE sports bar and to Defendant (Koenig Decl. ¶ 15); (b) an incident in which the Hartford insurance company attempted to process a claim involving Defendant but contacted Plaintiff's BOYNTON ALE HOUSE sports bar for information (Peterson Decl. ¶ 28; Exhibit 10), and (c) a sponsoring liquor distributor sent its representative to Plaintiff's Boynton Beach location instead of Defendant's location. (Koenig Decl. ¶ 15)

### 3. Actual Confusion – Job Applicants

Several job applicants have contacted Plaintiff thinking that there was a relationship or affiliation as between Plaintiff and Defendant.  Two of these involved prospective job applicants came directly to Plaintiff's BOYNTON ALE HOUSE for the purpose of completing applications for employment to work for Defendant (Koenig Decl. ¶ 17) while the third was an e-mail resume from an individual seeking employment at Plaintiff's Raleigh, North Carolina location. (Peterson Decl. ¶ 27 and Exhibit 9)  Plaintiff does not have any location in Raleigh, North Carolina, but there is a Carolina Ale House in Raleigh thought to be owned by the licensor of Defendant. (*Id.*)

### 4. Actual Confusion - Customers

After about five months of confusion, Plaintiff began keeping a log book to document instances of actual confusion in September 2008. (Koenig Decl. ¶ 13).  In the four-month period from September through December of 2008, there were dozens of instances of customer confusion (many including multiple customers), including: (a) customers incorrectly coming to

10

the Plaintiff's BOYNTON ALE HOUSE sports bar to meet their party; (b) customers asking about the relationship between the entities; (c) customers placing a carry-out food order at Defendant's location and then coming to Plaintiff's sports bar to pay for and pick-up the order; (d) customers calling Plaintiff's sports bar to complain about being charged twice on their credit cards at Defendant's location; (e) customers calling Plaintiff's sports bar to complain about harassment which occurred at Defendant's location; and (f) customers attempting to redeem discount coupons at Plaintiff's sports bar – the coupons were only for Defendant's Carolina Ale House (Defendant's only Palm Beach County area location) but said "valid at participating Palm Beach area location**s**" (emphasis added) . (Koenig Decl. ¶¶ 16, 18)

## III.   ARGUMENT

"A party seeking a preliminary injunction for trademark infringement must establish four elements: (1) substantial likelihood of success on the merits; (2) that it would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to the trademark owner outweighs whatever damage the injunction may cause to the alleged infringer; (4) that the injunction, if issued, would not be adverse to the public interest." *Davidoff & CIE, S.A. v. PLD Intern. Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001).

### A.   Plaintiff has Established More Than a Substantial Likelihood of Success

#### 1.   Likelihood of Confusion

In a trademark case, the following factors are considered in determining whether there is likelihood of confusion between two marks: (1) the type of mark, (2) the similarity of marks as between the parties, (3) the similarity of the products or services, (4) the similarity of the parties' retail outlets and customers, (5) the similarity of advertising media, (6) defendant's intent, and (7) actual confusion. *Aronowitz v. Health-Chem Corporation,* 513 F.3d 1229, 1239 (11th Cir.

11

2008). Each of these factors will be considered in turn below.

### a.     Type of Trademark

Plaintiff's Family of Marks is undeniably entitled to protection. Plaintiff has been using its Marks in Florida continuously since 1988, whereas Defendant did not enter the Florida market until 20 years later, long after Plaintiff had established its reputation based on five locations in Palm Beach County and 37 other locations throughout Florida, establishing significant goodwill in Plaintiff's Marks. Plaintiff's Family of Marks, if not inherently distinctive, have unquestionably acquired distinctiveness through long and continuous use. In this instance, Plaintiff clearly was the first to establish protectable rights in its Marks, giving Plaintiff priority over Defendant.

Plaintiff's mark has previously been held to be protectable in Florida. *See Ale House Management, Inc. v. Oakland Park Ale House, Inc.*, No. 97-15350 (03) (Fla. Cir. Ct., Broward County) (order). Even if a mark is considered generic, a second user cannot come into a trading area where public confusion will be created under Florida law. *Jet Air Freight v. Jet Air Freight Delivery, Inc.*, 264 So.2d 35, 38-39 (Fla. App. 3d Dist. 1972); *Williamson v. Answer Phone of Jacksonville, Inc.*, 118 So. 2d 248, 251 (Fla. App. 1 Dist. 1960). The public's interest is paramount. *Sundor Brands, Inc. v. Borden, Inc.,* 653 F.Supp. 86, 93 (M.D. Fla. 1986).

### b.     Similarity of Trademarks Favors Plaintiff

The Plaintiff's Marks and Defendant's mark are similar in terms of sight, sound and commercial impression. The Plaintiff's Marks include and Defendant's mark is each comprised of a geographical suggestive prefix followed by the term "Ale House". The same commercial impression is conveyed by the competing marks as the goods and services are substantially identical. Visually and phonetically Defendant's mark is similar to the Plaintiff's Marks.

Further, as discussed below, the similarities between the marks are such that a strong likelihood exists that the relevant public would perceive the Defendant's mark as being a member of the Plaintiff's well-known Family of Marks.

**c.      Similarity of Products and Services Favors Plaintiff**

Both parties operate sports bars, and the products, services, food and beverage items and price ranges for menu items are substantially identical for both parties.  As previously discussed, the term "sports bar" generally refers to restaurants which have numerous television monitors displaying various sporting events, the display of sports memorabilia, and various appetizer and food offerings as well as beverages. (Koenig Decl. ¶ 9)

**d.      Similarity of Retail Outlets and Customers Favors Plaintiff**

Both parties use the competing marks for sports bars, where the customers are of various age groups from college age to senior citizens. (Karaban Decl. ¶ 22)  The specific type of customer targeted by the parties is, as expected, the same, *i.e.* persons who would go into a sports bar to watch televised sporting events and/or for certain menu items expected at all sports bars along with accompanying persons.

**e.      Similarity of Advertising Media Favors Plaintiff**

Both parties advertise on the internet: Defendant at www.carolinaalehouse.com and Plaintiff at www.millersalehouse.com.  As discussed above, both parties advertise on their menus.  Both parties advertise in print media, such as Clipper Magazine, and both parties offer similar coupons - $5.00 off of every purchase of $25.00 or more.[11]

**f.      Defendant's Intent Favors Plaintiff**

In view of the attendant circumstances as demonstrated herein, it is difficult to envision

---

[11]      Of course, Defendant has forced Plaintiff to honor misleading coupons, as discussed above, to keep from upsetting customers who believe the coupons are redeemable at Plaintiff's various locations.

how Defendant credibly could claim to have been unaware of the Plaintiff and Plaintiff's Family

of Marks when Defendant opened its sports bar in the Palm Beach County area in April 2008.

Long before the Defendant opened its sports bar and began using its infringing mark, the

Plaintiff had established protectable rights in a Family of Marks and trade dress used in

connection with more than 40 sports bars, the first of which has been in operation for twenty (20)

years, with five of these establishments in the Palm Beach County area, the first of which,

BOYNTON ALE HOUSE, has been in existence for eighteen (18) years.   The Defendant's

sports bar is little more than a mile from Plaintiff's BOYNTON ALE HOUSE, and is on the

same street.[12]

A defendant's wrongful intent can be inferred from the totality of circumstances. *See*

*Nailtiques Cosmetic Corp. v. Salon Sciences Corp.,* 1997 WL 244746 at *3 (S.D. Fla. 1997)

(circumstances of competition and knowledge of plaintiff's mark).  The relevant circumstances

here strongly suggest that Defendant knowingly has sought to create confusion and to trade on

the goodwill developed in the Plaintiff's Family of Marks, including, *inter alia*, advertisements

in coupons that convey the false impression that Defendant's sports bar is part of the chain of

sports bars that Plaintiff operates in the Palm Beach County area under its Family of Marks.

As Plaintiff's expert has concluded, based on the   circumstances, there is virtually

---

[12]      Should this not be sufficient to demonstrate Defendant's knowledge of Plaintiff and Plaintiff's rights in its
Family of Marks, it seems highly unlikely that Defendant, as LMR's Florida licensee, would not have been aware of
prior federal court litigation between Plaintiff and LMR, concerning LMR's use of an alleged infringing mark in
North Carolina. Although the Fourth Circuit Court of Appeals decided that "Ale House" was generic for certain
types of restaurants, a conclusion with which Plaintiff disagrees, the Fourth Circuit did not include in its holding
trademarks comprised of a geographic prefix and "ALE HOUSE". Most importantly, the Fourth Circuit did not
have before it the problem of actual customer confusion because the parties were then operating in different states,
hundreds of miles apart.  Also, the North Carolina court did not consider Plaintiff's Florida common law rights,
which unquestionably are applicable in this dispute, and under which Plaintiff believes "ALE HOUSE" as used by
Plaintiff is entitled to protection. *See Ale House Management, Inc. v Raleigh Ale House,* 205 F.3d 137 (4th Cir.
2000). As a result, it appears that Defendant interpreted the North Carolina decision as giving it the right to infringe
Plaintiff's rights without regard to confusion of the public, as demonstrated by Defendant's plans of an LMR
licensee or LMR itself to open another Carolina Ale House approximately one mile from Plaintiff's Davie
restaurant.

nothing more that Defendant could do to engender customer confusion, to falsely convey in the public's mind an affiliation or association with Plaintiff, or otherwise to trade on Plaintiff's reputation and goodwill, than that already done by Defendant. (Karaban Decl. ¶ 37)

### g. Actual Confusion Favors Plaintiff

While evidence of actual confusion is not necessary to find a likelihood of confusion, actual confusion is the best evidence of a likelihood of confusion. *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1529 (11th Cir. 1985). Here, abundant evidence of actual confusion as to customers, suppliers (vendors),[13] and job applicants has been provided.

### 2. Infringement of a "Family" of Trademarks Has Been Established

Likelihood of confusion is manifest. It is undeniable that both parties use substantially similar trademarks for the same products and services, namely a sports bar; it is undeniable that the retail outlets (*i.e.*, sports bar restaurants) are the same; it is undeniable that the target customers are the same; it is undeniable that both parties use printed media and the internet for advertising; and it is undeniable that there has been substantial actual confusion.

Infringement of a "family of marks" involves the situation where a plaintiff has established rights in a market using a number of trademarks having a common element, and the Defendant enters into the market using a mark that gives the appearance of being a member of the plaintiff's family of trademarks. Infringement exists even if it can be said that the defendant's mark would not be confusingly similar to any single mark of the plaintiff. In this instance, the Plaintiff's Family of Marks is comprised of marks combining a geographic prefix with the term "Ale House". Both the geographic prefix and the term "Ale House" are common elements of the Plaintiff's Family of Marks, and Defendant's "Carolina Ale House" copies the

---

[13]     *See Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1167 (11th Cir. 1982) (noting that suppliers are "precisely those whose confusion is most significant . . . as evidence of actual confusion" because they are "presumably relatively familiar with an enterprise").

Plaintiff's Family of Marks, incorporating both of these common elements.   The trademark of the second entrant into the market is confusingly similar to the first user's family of marks when it is only the prefix which changes.   *W.B. Roddenbery Co. v. Kalich*, 158 F.2d 289 (C.C.P.A. 1946) (Big Patch is confusingly similar to Cane Patch, Pickle Patch and Patch); *The Black & Decker Corp. v. Emerson Electric Co.*, 2007 WL 894416 (T.T.A.B. 2007) (Dirt Hawg and Water Hawg are confusingly similar to Hedge Hog, Edge Hog, Grass Hog, Lawn Hog).

Here, Defendant is a junior user of a trademark that falls within the format of Plaintiff's Family of Marks.   The Defendant's use of its mark is clearly and demonstrably causing confusion in the marketplace, and Plaintiff's Family of Marks are entitled to protection. Otherwise the confusion, and the harm not only to the Plaintiff but to the public, will continue unabated.   *See D.J. Bielzoff Products Co. v. White Horse Distillers*, 107 F.2d 583, 586 (C.C.P.A. 1939).[14]   It cannot be forgotten that Defendant purposely sought to inject itself into the Family of Marks by the use of the misleading coupons referencing multiple locations when Defendant only has one.

### 3.    Trade Dress Infringement Has Been Established

Plaintiff's claim for infringement of its protectable, unregistered trade dress is based on § 43(a) of the Lanham Act as well as Florida common law.   *Carnival Corp. v. SeaEscape Casino Cruises, Inc.,* 74 F. Supp. 2d 1261, 1264 (S.D. Fla 1999).   Trade dress protection is afforded to the look and feel, *i.e.*, the "overall image and visual impression".   *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763 (1992).   In order to prevail, Plaintiff must prove that (1) the trade dress of the two businesses is confusingly similar, (2) that the features of the trade dress are

---

[14]        Obviously, if a second entrant into the market such as Defendant here is permitted to adopt and use a mark that is confusingly similar to an established family or mark, so could the third, fourth and fifth entrant into the market, (with none having the right to complain about any subsequent entrant into the market), a scenario that would dilute and eventually destroy the value of Plaintiff's Family of Marks, with no end to consumer confusion. *Id.*

primarily non-functional and (3) that the trade dress is inherently distinctive or has acquired secondary meaning. *See Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996).

Plaintiff relies on a number of confusingly similar elements for its trade dress claim including (a) ALE HOUSE in red lettering on the building, (b) the ALE HOUSE name in red and yellow in print media, (c) the uniforms of the servers, (d) the type of bar, (e) the location of high top tables, (e) the open kitchen, (f) the floor plan, etc. (Karaban Decl. ¶¶ 31-33) Defendant's floor plan bears an unmistakable resemblance to the protected floor plan of Plaintiff's restaurants identified under Copyright Registration No. Vau000434206. (Peterson Decl. ¶ 31)

The evidence demonstrates that as to each of these, the trade dress of the two businesses is either identical or confusingly similar. The evidence demonstrates that, in the sports bar context, the features are primarily non-functional. For example, any color could be used on the side of the building for the name of the establishment,[15] any color combination could be used for the uniforms for the servers, any shape could be used for the bar, etc. Trade dress is non-functional when it is not essential to the provision of the service nor affects cost or quality, or if alternate designs are available without placing competitors at a significant disadvantage. *Dippin' Dots, Inc. v. Frosty Bites Distr. LLC,*, 369 F.3d 1197,1203 (11th Cir. 2004).

Plaintiff's trade dress presents a combination of elements that creates a unique look and feel for a sports bar.[16] Therefore, Plaintiff's trade dress is inherently distinctive, or, at the very least, it has acquired distinction because Plaintiff has been using its trade dress consistently and

---

[15]    While a red-lettered sign would be expected for a restaurant named "Red Lobster" or a green-lettered sign would be expected for a restaurant following an Irish Pub theme, the choice of red letters here is arbitrary and non-functional.

[16]    Viewed from an even broader context, the "look and feel" of a product or service can encompass the use of a trade name or trademark as well as the other elements comprising trade dress. *See e.g., Western Publishing Co., Inc. v. Publications Intern., Ltd.*, 1995 WL 1684082, at * 2 (N.D. Ill. 1995). Courts have granted preliminary injunctions based on evaluations of look and/or feel. *See Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1275 (10th Cir. 1988) (affirming district court's grant of preliminary injunction based on "overall appearance or look").

continuously in Florida since 1988.[17]   Plaintiff's distinctive and famous position in the market was achieved well before Defendant opened its Carolina Ale House sport bar in Boynton Beach in April 2008.   Given the high degree of similarity between Plaintiff's trade dress and the trade dress used by Defendant, public confusion is not surprising.   Accordingly, a finding of likelihood of confusion between trade dresses generally provides sufficient grounds to justify issuance of a preliminary injunction, without further evidence of actual injury.   *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997); *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 449 (S.D.N.Y. 2000).

### C. Plaintiff Will Suffer Further Irreparable Injury Unless Defendant Is Immediately Enjoined From Using Plaintiff's Family of Marks and Trade Dress

Defendant's continued use of its infringing mark alone or with a substantially similar trade dress has created substantial confusion.   Further confusion is inevitable.   "The existence of a likelihood of confusion constitutes irreparable injury, as a matter of law, sufficient to satisfy the requirements of Fed. R. Civ. P. 65."   *Sundor Brands*, 653 F.Supp. at 93 (citing *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530).   Having shown actual confusion, Plaintiff has suffered irreparable injury and will continue to do so if this Court does not grant injunctive relief.

The irreparable injury has been exacerbated by problems at Defendant's location, including customers having their credit cards charged multiple times by Defendant with the customers then calling Plaintiff for redress.   It is impossible to measure whether those dissatisfied customers will ever visit Plaintiff's sports bars and/or what negative statements they will make to their friends.

---

[17]      As explained by Plaintiff's expert, no restaurant, and certainly no restaurant chain or family of restaurants could grow for 20+ years, from a single establishment into a 47 restaurant chain, without high quality food and service, and the secondary meaning attributable to at least its name if not its trade dress. (Karaban Decl. ¶ 27)

### D. The Actual and Threatened Injury To Plaintiff Clearly Outweighs Any Potential Harm To Defendant

The balance of hardships tips decidedly in Plaintiff's favor. Plaintiff will suffer irreparable damage if Defendant is permitted to continue to infringe. Constant consumer confusion, instances of double charging credit cards, customer harassment, deceiving use of coupons, etc., can do nothing other than diminish the goodwill which Plaintiff has built in Florida since 1988. Conversely, if an injunction is granted, Defendant will not suffer *any* legitimate harm nor will it incur any damages. An injunction would prevent Defendant from using a mark and trade dress in a location that it is not otherwise entitled to use. *See Clayton v. Howard Johnson Franchise Sys., Inc.*, 730 F. Supp. 1553, 1561-62 (M.D. Fla. 1988). Thus, the threatened injury to Plaintiff from Defendant's infringement substantially outweighs any potential harm to Defendant.

### E. The Public Interest Favors Granting An Injunction

In trademark infringement cases, "a third party, the consuming public, is present and its interests are paramount." *Sundor Brands, Inc.*, 653 F. Supp. at 93. Injunctive relief serves the public interest by stopping Defendant's deception and ensuring that the public is free from deception and confusion. "Public policy concerns . . . weigh in favor of preliminary injunctive relief in order to minimize confusion in the marketplace." *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1364 (citing *Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1207 (11th Cir. 1997) (recognizing strong public interest in preventing the deception of consumers)); *see also Teledyne Indus., Inc. v. Windmere Prods., Inc.*, 433 F. Supp. 710, 740 (S.D. Fla. 1977) ("customer confusion is by its very nature against the public interest"). Moreover, the imposition of a preliminary injunction will have no countervailing harm to the public and, indeed, will end the actual confusion of the public.

## IV.    CONCLUSION

Plaintiff has a strong likelihood of success on the merits of its claims in this action and is being exposed to irreparable harm to its valuable goodwill by Defendant's unjustified use of a trademark and trade dress that infringes Plaintiff's rights. Continued consumer confusion is inevitable. The balance of harm and public interest favor immediate equitable relief.

Based on the foregoing, Plaintiff, respectfully requests this Court to preliminarily enjoin, Defendant from: (a) making any use of "Carolina Ale House" as a trademark or trade name, or any other trademark or trade name that is confusingly similar to Plaintiff's Marks or Plaintiff's Family of Marks; (b) making any use of Plaintiff's trade dress or any colorable imitation thereof, (c) manufacturing, producing, distributing, circulating, selling or otherwise using any printed material, including coupons, which bears a copy or colorable imitation of Plaintiff's trademark, family of marks and/or trade dress and/or which suggest a relationship with Plaintiff.

Dated: *6/19/09*
West Palm Beach, Florida

Respectfully submitted,

J. Rodman Steele (Florida Bar No. 356786)
rodman.steele@novakdruce.com
Jerold I. Schneider (Florida Bar No. 0026975)
jerold.schneider@novakdruce.com
**NOVAK DRUCE + QUIGG LLP**
525 Okeechobee Blvd, 15th Floor
West Palm Beach, FL 33401
Telephone:  561-838-5229
Facsimile:   561-838-5578

Wesley A. Lauer (Florida Bar No.: 137851)
Email: wesley.lauer@akerman.com
**AKERMAN SENTERFITT**
222 Lakeview Ave., 4th Floor
West Palm Beach, FL  33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313

Attorneys for Plaintiff

20



# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| MILLER'S ALE HOUSE, INC.       ) | |
|          ) | |
|     Plaintiff,     ) | |
|          ) | |
| v.     ) | Civil No. |
|          ) | |
| BOYNTON CAROLINA     ) | |
| ALE HOUSE, LLC     ) | |
|          ) | |
|     Defendant.     ) | |
|          ) | |

## DECLARATION OF KIRK HUMPHREYS

Kirk Humphreys being duly sworn, states:

1.      I am over the age of 18 and would competently testify to the following based on my own knowledge.

2.      I make the declaration in support of the above captioned lawsuit.

3.      I am a paralegal with the law firm of Novak Druce + Quigg LLP.

4.      I have been practicing as a paralegal in the State of Florida since 1987 and I am a Florida Registered Paralegal with the Florida Bar.

5.      I am responsible for the documents in the above captioned case on behalf of Miller's Ale House, Inc.

6.      Attached as Exhibit 7 is a true and complete copy Boynton Carolina Ale House, LLC dba Carolina Ale House License Agreement, which is attached as exhibit "A" to LM Restaurants, Inc.'s Response Opposing Defendant's Motion to Dismiss (DE # 53 in LM

Restaurants, Inc. v. Miller's Ale House, Inc., Case No: 5:08-CV-617-F, United States District

Court for the Eastern District of North Carolina, Western Division).

      7.      Further affiant sayeth not.


Executed on the _19ᵀᴴ_ day of June, 2009
under penalty of perjury of the laws
of the United States.

                                    Kirk Humphreys

2



# EXHIBIT 7

**Exhibit A**

# Boynton Carolina Ale House, LLC

# dba Carolina Ale House

# License Agreement

# TABLE OF CONTENTS

Article I.  Definitions ............................................................................................5

Article II.  Grant of License ....................................................................................6

Article III.  License Fee and Royalties ................................................................8

Article IV.  Payments, Records and Access to Net sales ...............................8

Article V.  Use of Marks ........................................................................................9

Article VI.  Quality Control and Inspection ....................................................10

Article VII.  Menu ..................................................................................................13

Article VIII.  Advertising.......................................................................................13

Article IX.  Approval of Building Design .........................................................14

Article X.  Training and Opening Team ...........................................................15

Article XI.  Term.....................................................................................................15

Article XII.  Termination.......................................................................................16

Article XIII.  Equitable Relief .............................................................................17

Article XIV.  Attorney Fees, Costs, Etc.............................................................18

Article XV.  Warranties and Representations .................................................19

Article XVI.  Indemnification .............................................................................19

Article XVII.  Limitations on Competition.......................................................20

Article XVIII.  First Right of Refusal to Purchase Building and Real Estate 22

Article XIX.  Confidentiality and Use Restrictions.........................................23

Article XX.  Relationship of the Parties ...........................................................23

Article XXI.  Waiver ..............................................................................................24

Article XXII.  Assignment ...................................................................................24

2

**Article XXIII.  Section Headings** ..................................................................25

**Article XXIV.  Severability** ........................................................................25

**Article XXV.  Further Documents**................................................................25

**Article XXVI.  Governing Law and Venue**......................................................25

**Article XXVII.  Notices**..............................................................................26

**Article XXVIII.  Entire Agreement**................................................................26

3

**LICENSE AGREEMENT**

THIS LICENSE AGREEMENT is made this 1st day of September, 2007 by and between LM Restaurants, Inc. (hereafter "Licensor") having a principal place of business at 5404 Hillsborough Street, Raleigh, NC 27606-1339, and Boynton Carolina Ale House, LLC (hereafter "Licensee") having a principal place of business at 365 N. Congress Ave, Boynton Beach, FL  33426, and Lou Moshakos and John Politis as the members of Licensee (hereafter "Principal Owner").

WHEREAS Licensor is the owner of the CAROLINA ALE HOUSE service mark and the CAROLINA ALE HOUSE LOGO (Exhibits 1 and 2) used in connection with restaurant and bar services and collectively referred to herein as the "Licensed Marks".  Licensor is the owner of United States Trademark Registration No. 3,038,753 (Exhibit 3) for the Licensed Marks.  Licensor is also the owner of a distinctive restaurant and bar trade dress (the "Carolina Ale House Trade dress").  The Licensed Marks and the Carolina Ale House Trade Dress are currently used in connection with a number of Carolina Ale House Restaurant and Bars owned by affiliated businesses of Licensor, and located in Raleigh, Durham, Wake Forest and Cary, North Carolina, Weston and Boynton Beach, Florida, and Columbia, South Carolina (hereinafter "Licensor's Carolina Ale House Restaurant and Bars").

4

WHEREAS Licensee is desirous of acquiring a non-exclusive license to use the Licensed Marks and Carolina Ale House Trade Dress in connection with a restaurant and bar establishment to be located in Boynton Beach, FL.

WHEREAS Licensor is willing to grant Licensee a non-exclusive license to use the Licensed Marks and Carolina Ale House Trade Dress under terms and conditions set forth herein.

WHEREAS John Politis, one of the members of Licensee, is willing to enter into this Agreement and be bound by the terms of this Agreement including the non-compete provisions of Article XVIII.

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is acknowledged, all of the parties hereto agree as follows:

**Article I. Definitions**

1.1     The term "Licensed Marks" shall mean CAROLINA ALE HOUSE (Exhibit 1) used in connection with restaurant and bar services, and the CAROLINA ALE HOUSE LOGO (Exhibit 2) used in connection with restaurant and bar services.

1.2     The term "Licensor's Carolina Ale House Restaurant and Bars" shall mean various restaurant and bars owned by entities affiliated with and licensed by Licensor and which use the Licensed Marks.  As of the date of execution of this Agreement, Licensor's Carolina Ale House Restaurant and Bars include:

5

A.    The Carolina Ale House Restaurant and Bar located at
      Alexander Place, 7981 Skyland Ridge, Raleigh, NC  27617;

B.    The Carolina Ale House Restaurant and Bar located at 2240
      Walnut Street, Cary, NC  27513;

C.    The Carolina Ale House Restaurant and Bar located at 512
      Creekside Drive, Raleigh, NC  27609;

D.    The Carolina Ale House Restaurant and Bar located at 3911
      Durham Chapel Hill Blvd., Durham, NC  27707;

E.    The Carolina Ale House Restaurant and Bar located at 4512
      Falls of Neuse Road, Raleigh, NC  27609;

F.    The Carolina Ale House Restaurant and Bar located at 2618
      Weston Rd., Weston, FL  33331;

G.    The Carolina Ale House Restaurant and Bar located at
      11685 Northpark Drive, Wake Forest, NC  27587-4533; and

H.    The Carolina Ale House Restaurant and Bar located at 277
      Columbiana Drive, Columbia, SC  29212.

1.3    The term "Net sales" shall mean gross sales made by the Licensed
Carolina Ale House Restaurant and Bar minus customer credits.

1.4    The term "Licensed Carolina Ale House Restaurant and Bar" shall
mean the restaurant and bar located or to be located at 365 N. Congress Ave.
Boynton Beach FL and which will be operated under the Licensed Marks.


**Article II.  Grant of License**

6

2.1     Licensor hereby grants to Licensee for the term of this Agreement, a non-transferable, non-exclusive, royalty bearing right and license to use the Licensed Marks in connection with only one restaurant and bar establishment, the "Licensed Carolina Ale House Restaurant and Bar".

2.2     Licensor also hereby grants to Licensee for the term of this Agreement, a non-transferable non-exclusive royalty bearing right and license to use the Carolina Ale House Trade Dress in connection with the Licensed Carolina Ale House Restaurant and Bar.

2.3     The License granted herein is limited to restaurant and bar services, and does not extend to any other goods or services.

2.4     Licensee acknowledges the validity of the Licensed Marks and Carolina Ale House Trade Dress and that the Licensed Marks and the Carolina Ale House Trade Dress are owned by Licensor.  Licensee further acknowledges that the Carolina Ale House Trade Dress is inherently distinctive and unique, and has acquired a secondary meaning inasmuch as consumers recognize and associate the Carolina Ale House Trade Dress with a single source.  Licensee agrees not to contest the validity or ownership of the Licensed Marks or the Carolina Ale House Trade Dress, or to do or cause to be done any act contesting the validity or ownership of the Licensed Marks and Carolina Ale House Trade Dress.

2.5     During the term of this Agreement, Licensor agrees not to license the Licensed Marks or the Carolina Ale House Trade Dress for use in connection

7

with a restaurant and bar establishment within a five mile radius of the Licensed Carolina Ale House Restaurant and Bar.

2.6    If after one year from the date of opening the Licensed Carolina Ale House Restaurant and Bar, Licensee has fully complied with all provisions of this License Agreement, including all quality standards established by this Agreement or later implemented, then Licensee will be given a first right of refusal to obtain a license to build and operate Carolina Ale House Restaurant and Bars in the Boynton Beach, FL market.  Licensor in its sole discretion will determine if Licensee has fully complied with all provisions of this License Agreement and all quality standards.

**Article III.  License Fee and Royalties**

3.1    Licensee shall pay Licensor, simultaneously with the execution of this Agreement, a $50,000 non-refundable licensing fee.

3.2    In addition to the licensing fee set forth in Section 3.1, Licensee shall pay Licensor an ongoing royalty equal to 5% of net sales of the Licensed Carolina Ale House Restaurant and Bar.

**Article IV.  Payments, Records and Access to Net sales**

4.1    Royalty payments as provided for in Section 3.2 will be paid on a monthly basis.  On or before the 15th day of each month Licensee will pay Licensor the royalties due on net sales of the Licensed Carolina Ale House Restaurant and Bar for the previous month.

8

4.2     Licensee shall accompany each payment with a report verified by Licensee's Chief Financial Officer, which shall set forth the net sales for the Licensed Carolina Ale House Restaurant and Bar for the Month for which the royalty payment is made.

4.3     Licensee agrees to provide Licensor with dial-up access to daily, weekly, and monthly net sales information for the Licensed Carolina Ale House Restaurant and Bar.

4.4     Licensee agrees to maintain adequate books and records of its operations in accordance with good and accepted accounting practices so as to provide Licensor with all necessary information to enable it to verify the accuracy of royalties paid and the royalty reports submitted by the Licensee pursuant to Sections 3.2, 4.1, and 4.2.  Licensee agrees that these books and records shall be open to inspection, upon reasonable notice, at least once annually by Licensor, its agents or other designated personnel.

**Article V.  Use of Marks**

5.1     Licensor has the sole right to control how the Licensed Marks are used including control of the appearance, style and manner of use.  Unless specifically approved in writing by Licensor, Licensee agrees to use the Licensed Marks only in the standard form in Exhibit 2.

5.2     From time to time, Licensor may adopt new marks to be used in connection with the various Carolina Ale House Restaurant and Bars, or may

9

adopt new forms for the Licensed Marks.  Licensee agrees to use any new marks adopted or any new forms for the Licensed Marks.

5.3    All uses of the Licensed Marks will conform to Licensor's use standards as exemplified, for example, by the standard usage that appears at the Brier Creek Carolina Ale House Restaurant and Bar located in Raleigh, North Carolina.  The Licensed Marks will be used at certain locations on and in the building of the Licensed Carolina Ale House Restaurant and Bar, and on menus, tabletops, uniforms, advertisements, and promotional materials.  Any use of the Licensed Marks that departs from Licensor's use standards must be approved in writing by the Licensor.

5.4    Licensee agrees to use only Licensor's marks, that is the Licensed Marks and marks expressly approved by Licensor, and not to combine any other mark or marks with the CAROLINA ALE HOUSE mark or the CAROLINA ALE HOUSE LOGO.  Any additional marks, logos or designs used in connection with the Licensed Carolina Ale House Restaurant and Bar must be approved in writing by Licensor.


## Article VI.  Quality Control and Inspection

6.1    Licensee acknowledges that the continued maintenance of the Licensed Marks and associated good will, and the continued maintenance of the quality and standard of the services associated with the Licensed Marks are essential elements of this License Agreement and must be maintained at all times.  Therefore, the quality of Licensee's service shall at all times be subject to

the approval of Licensor. Licensor has the right to set quality control standards, and the right to inspect and exercise quality control. Licensee acknowledges that its failure to adhere to any of the terms and conditions of this article will constitute a material breach of this Agreement.

6.2    Licensee is aware of the quality standards and consistent high quality of services offered at Licensor's Carolina Ale House Restaurant and Bars. Licensee agrees that the services and food and beverage products offered at the Licensed Carolina Ale House Restaurant and Bar will conform to and meet the same high standards of quality as is present in Licensor's Carolina Ale House Restaurant and Bars.

6.3    Licensor, through designated representatives, has the right to inspect the Licensed Carolina Ale House Restaurant and Bar at least once every three months to determine if Licensee is meeting Licensor's quality standards. The scope and extent of the inspection will be determined solely by Licensor and will include, but not be limited to, an inspection of the quality of food and beverages, an inspection of the kitchen and the procedures employed for preparing and serving food, an inspection of bar areas, an inspection of the overall facility for cleanliness, neatness and general appearance, and an inspection of the overall operation and quality of service.

6.4    Licensor is the sole judge of whether Licensee is meeting Licensor's standards of quality.

6.5    Licensee agrees that in the event that Licensor determines that the services being offered by the Licensed Carolina Ale House and Bar fail to meet

11

Licensor's high standard of quality, then in that event, the Licensee will, at its own expense, take measures and steps to improve the quality of services to meet the required high standards of quality of the Licensor.

     6.6    Licensee agrees to comply with all local, state, and federal laws and regulations.

12

**Article VII.  Menu**

7.1     Licensor has sole discretion to determine what may be included in Licensee's menu.

7.2     Menus and drink lists must conform in format, design, layout and general content and appearance to Licensor's standard menu shown in Exhibit 4.

7.3     Licensee's initial menu and drink list must be approved by Licensor. Thereafter, any changes to the menu used at the Licensed Carolina Ale House Restaurant and Bar must be reviewed and approved in writing by Licensor.

7.4     Licensee has a limited right to vary menu items or drinks to meet local tastes or customs, but any and all variations to the menu or drink list must be approved in writing by Licensor.


**Article VIII.  Advertising**

8.1     Licensee agrees to use the Licensed Marks to advertise the Licensed Carolina Ale House Restaurant and Bar.  Advertising shall not contain any deceptive, misleading or scandalous material.

8.2     Licensee agrees to follow closely the advertising image and copy concepts being used by Licensor's Carolina Ale House Restaurant and Bars. Licensor retains the right in its sole discretion to reject any advertisement or promotion that it deems inconsistent with past and present advertising policies of Licensor as exemplified by the advertising programs carried out on behalf of Licensor's Carolina Ale House Restaurant and Bars.

13

8.3     During each calendar year, Licensee agrees to expend for advertising an amount equal to at least 2% of the net sales of the Licensed Carolina Ale House Restaurant and Bar.

8.4     Licensee will have the option, but will not be required, to purchase from certain food and beverage vendors used by Licensor's Carolina Ale House Restaurant and Bars.  In some cases Licensee may directly receive rebates by virtue of such purchases.  Licensee agrees to use all such rebates for local advertising, and these advertising expenditures will not count towards the 2% requirement set forth in Section 8.3 above.

8.5     In February of each calendar year, Licensee shall submit to Licensor an advertising expenditure report that sets forth Licensee's total advertising expenditures for the preceding calendar year, and the amount of vendor rebates received pursuant to Section 8.4 above.

## Article IX.  Approval of Building Design

9.1     Licensor in its sole discretion has the right to control all aspects of the building design of the Licensed Carolina Ale House Restaurant and Bar including exterior and interior design as well as general layout of the building and its décor and general motif.  Licensor and Licensee acknowledge that Licensor has consulted with Licensee concerning the overall design of the Licensed Carolina Ale House Restaurant and Bar and Licensor agrees to continue to consult and advise the Licensee with respect to the design until construction begins on the building.  Prior to beginning the construction of the building at 365

14

N. Congress Ave. Boynton Beach, FL 33426 the architectural drawing, including specifications and interior design, must be submitted to Licensor and Licensor must approve in writing the architectural drawings and interior design prior to the commencement of construction. Thereafter, any enlargement or reduction in size of the building, or any significant or substantial change in overall appearance, exterior or interior design, or layout must be approved in writing by the Licensor.

## Article X.  Training and Opening Team

10.1    Prior to opening the Licensed Carolina Ale House Restaurant and Bar, Licensee agrees to participate in a management level training program where at least six (6) management level employees of Licensee will train at least eight (8) weeks in one or more of Licensor's Carolina Ale House Restaurant and Bars. The six individuals must include at least the head chef, one other kitchen employee, and four front management level personnel. All expenses, such as travel and lodging, to be borne by Licensee.

10.2    Licensor agrees to furnish at no cost to Licensee an opening team that will be on site at the Licensed Carolina Ale House Restaurant and Bar on the date of the opening and for a period of at least one (1) week thereafter.

## Article XI.  Term

11.1    This Agreement shall remain in force for a period of twenty (20) years beginning on the date of execution of this Agreement, unless otherwise

earlier terminated pursuant to this Agreement.  The Agreement may be renewed by mutual consent.

**Article XII.  Termination**

12.1    If either Licensor or Licensee breaches this Agreement, the other party shall have the right to terminate this Agreement by giving written notice of termination.  When written notice of termination is given, termination shall become effective automatically upon the expiration of forty-five (45) days unless the default is cured by the defaulting party and notice of the cure, along with appropriate proof, is submitted to the non-defaulting party in writing within the forty-five (45) day period.

12.2    In the event that Licensee becomes insolvent, or if the Licensee is unable to fulfill its duties or obligations under this Agreement, then Licensor may immediately terminate this Agreement by giving written notice of termination to Licensee.

12.3    Licensee agrees to notify Licensor of its intention to file a voluntary petition in bankruptcy or of another's intention to file an involuntary petition in bankruptcy.  This notice to be received by Licensor at least thirty (30) days prior to the filing of such petition.  Licensee's failure to conform to this requirement shall be deemed a material and incurable breach.

12.4    This Agreement and all rights granted herein shall terminate immediately upon written notice from Licensor to Licensee in the event that

16

Licensee or any of its principals become affiliated, directly or indirectly, with a competitor of Licensor.

12.5   This Agreement and all rights granted herein shall terminate immediately upon written notice if the quality of services being rendered by the Licensed Carolina Ale House Restaurant and Bar repeatedly fails to meet the Licensor's standards of quality.

12.6   This Agreement and all rights granted herein shall terminate immediately in the event that Licensee ceases using the Licensed Marks or ceases operating the Licensed Carolina Ale House Restaurant and Bar.

12.7   Upon or after the expiration or termination of this Agreement, for whatever reason, all rights granted to Licensee hereunder shall cease immediately.

12.8   Termination of this Agreement for any reason shall not affect obligations, including the payment of royalties pursuant to Section 2.2, which have accrued as of the date of termination and those obligations which are intended to survive termination of this Agreement.  In no case shall either party have any claim for repayment of any sum or sums that shall have been paid as provided under the terms of this Agreement.

**Article XIII.  Equitable Relief**

13.1   Upon termination of this Agreement for any reason, Licensee agrees to immediately cease using the CAROLINA ALE HOUSE mark, the CAROLINA ALE HOUSE LOGO, and the Carolina Ale House Trade Dress.  All

17

menus, signs, advertising materials, promotional materials and other printed matter bearing the Licensed Marks are to be delivered to Licensor at the expense of Licensee or destroyed in the presence of Licensor's authorized representative. Licensee acknowledges and admits that there is no adequate remedy at law for its failure to cease using the CAROLINA ALE HOUSE mark, the CAROLINA ALE HOUSE LOGO, or the Carolina Ale House Trade Dress in the event of termination.  Accordingly, Licensee agrees that in the event of such termination and Licensee's continued use of the CAROLINA ALE HOUSE mark, the CAROLINA ALE HOUSE LOGO, the Carolina Ale House Trade Dress, or any mark or trade dress confusingly similar thereto, Licensor shall be entitled to equitable relief by way of a temporary restraining order, temporary and permanent injunctions, and such other and further relief as a court may deem proper.

**Article XIV.  Attorney Fees, Costs, Etc.**

14.1   In the event either party brings any action, suit or proceeding against the other party to enforce any right or entitlement which it may have under this Agreement, either party shall, to the extent it is successful in pursuing or defending the action, and in addition to all other rights or remedies available to it in law or in equity, be entitled to recover its reasonable attorney fees and costs incurred in such action.

18

**Article XV.  Warranties and Representations**

15.1    Licensor represents and warrants that it is the owner of the Licensed Marks and that it has the right to grant the non-exclusive right and license to the Licensed Marks under the conditions set forth herein.  Licensor makes no other warranties or representations, and no other warranties or representations are to be implied.  Licensee acknowledges that Licensor has made no projections or representations regarding the amount of income or profit that the Licensee can expect from the Licensed Carolina Ale House Restaurant and Bar.  Licensee also acknowledges that Licensor has made no representations guaranteeing or assuring success of the Licensed Carolina Ale House Restaurant and Bar.

**Article XVI.  Indemnification**

16.1    Licensee agrees to indemnify and hold Licensor harmless from all claims, damages and/or losses arising from the operation of the Licensed Carolina Ale House Restaurant and Bar.  This indemnification shall include reimbursements for any and all costs, expenses and reasonable attorney fees incurred by Licensor in defense of any such claims.

16.2    Licensor agrees to indemnify and hold Licensee harmless from any and all claims, damages or losses resulting from claims of trademark infringement with respect to the Licensed Marks.

**Article XVII.  Limitations on Competition**

17.1     During the term of this Agreement, Licensee and Principal Owner agree not to own (in whole or part), manage, operate, be employed by or affiliated with another restaurant or bar having a sports theme.

17.2     For a period of five (5) years after the termination of this Agreement for any reason, the Licensee and Principal Owner agree not to directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee, engage in the business of restaurant or bar services within a fifty (50) mile radius of the location of the Licensed Carolina Ale House Restaurant and Bar.

17.3     For a period of three (3) years after the termination of this Agreement for any reason, the Licensee and Principal Owner agree not to directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee engage in the business of restaurant or bar services, where the restaurant or bar includes a sports theme, in the Southeastern United States including the states of North Carolina, South Carolina, Georgia, Florida, Virginia and Tennessee.

17.4     Licensee and Principal Owner further covenant that they will:

A.       Never use any materials regarding the Licensor's marks, trade dress, or copyrighted materials without payment of applicable royalty fees;

20

B.    Never do any deliberate act prejudicial or injurious to the goodwill or name of Licensor;

C.    Use the words "Ale House" in any trademark, brand, or good or service description for ten (10) years after the termination date of this Agreement.

17.5   If Licensee or Principal Owner violates any of the provisions of this Article XVII, Licensor will be entitled to the royalty fee from Licensee or Principal Owner for the territory in which the violation occurred, and will be entitled to all profits Licensee or Principal Owner derived from such operations in violation of such provisions. The parties expressly acknowledge and agree that such payment will not affect any other rights or remedies Licensor may have, at law or in equity (including the right to seek injunctive relief), against Licensee or Principal Owner by reason of the violation of this paragraph.

17.6   Licensee and Principal Owner have carefully read and considered the provisions of paragraphs 17.2, and 17.3, and, having done so, acknowledges that such restrictions, including but not limited to the time periods and geographical areas of such restrictions, are fair and reasonable and are reasonably required for the protection of the interest of the Licensor, its licensees, and their respective customers. Licensee and Principal Owner further acknowledge that the licenses, know how, and materials from Licensor are special, unique and extraordinary, and that this Agreement would not be entered into by Licensor except upon condition that the provision of this Article XVII be

21

included herein and that, as such, they be enforceable, in the event of a Breach by Licensee, by injunctive relief.

17.7   If any provisions of paragraphs 17.2 or 17.3 relating to time periods or geographical areas is found by a court of competent jurisdiction to exceed the maximum time period or geographical area such court deems reasonable and enforceable, the parties agree that such court should enforce such provisions for such time period and within such geographical area as the court finds to be reasonable.  In addition, the Licensor in its ole and absolute discretion may unilaterally reduce the scope of any provision of these paragraphs relating to time periods or geographical areas.

17.7   If, notwithstanding the foregoing, any provision of paragraphs 17.2 or 17.3 is held to be invalid or unenforceable, such provision will be deemed to be separable and divisible from the remaining provisions, which will continue to be valid and enforceable as though the invalid and enforceable provision had not been included therein.

## Article XVIII.  First Right of Refusal to Purchase Business, Building and Real Estate

18.1   Licensee represents that it will lease from DDRTC Boynton Commons, LLC a certain parcel of real estate, including a building, located at 365 N. Congress Ave Boynton Beach, FL  33426, and that the Licensed Carolina Ale House Restaurant and Bar will be located on the leased property.  Licensee agrees that as a condition for entering into the lease with DDRTC Boynton Commons, LLC that DDRTC Boynton Commons, LLC will grant Licensor a first

22

right of refusal, based on a bonified offer, to purchase the real estate and building located at 365 N. Congress Ave Boynton Beach, FL  33426, in the event of a sale.

18.2    Licensee grants to Licensor a first right of refusal, based on a bonified offer, to purchase Licensee's business, Carolina Ale House Operating Company LLC, or any interest in Licensee's business or Carolina Ale House Operating Company LLC.  In the event that Licensee or Principal Owner intends to sell the Licensee's business (including the business intended to be carried out at 365 N. Congress Ave Boynton Beach, FL) or any interest in its business or Carolina Ale House Operating Company LLC, the Licensee agrees to give Licensor fifteen (15) days written notice of the proposed sale including details and all terms of the offer and proposed sale.  Licensor will have fifteen (15) days after receiving notice to match the offer.

## Article XIX.  Confidentiality and Use Restrictions

19.1    Quality control standards, recipes and other know-how furnished to Licensee is the property of Licensor and shall be held in confidence and used only for the purpose of this Agreement.  Upon termination of this Agreement, all quality control standards, recipes and other confidential information shall be returned to the Licensor.

## Article XX.  Relationship of the Parties

23

20.1    It is the intention of the parties to enter into a License Agreement and accordingly, the relationship established by this Agreement is one of Licensor-Licensee.  Licensee shall not be the agent of Licensor and shall not have authority to act for or on behalf of Licensor in any matter.  The parties further agree that the relationship between Licensee and Licensor is neither an employee-employer relationship nor a franchisee-franchisor relationship.

## Article XXI. Waiver

22.1    The failure of either party at any time, or for any period of time, to enforce any of the provisions of this Agreement shall not be construed as a waiver of such provision or the right of such party thereafter to enforce each and every provision of this Agreement.

## Article XXII. Assignment and Sale of Licensee

22.1    The License hereby granted is restricted to use by Licensee and may not be assigned to or exercised by any other person, firm, corporation or business without the prior written consent of Licensor.  Subject to the foregoing sentence, this Agreement shall inure to the benefit and be binding upon the parties hereto, their successors and assigns.  Licensor may assign the License without the prior written consent of the Licensee.

22.2    Licensee agrees that it will not sell its business, or a majority interest of its business, without the written consent of Licensor.  Licensor agrees that consent will not be unreasonably withheld.

24

**Article XXIII.  Section Headings**

23.1    The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Agreement.

**Article XXIV.  Severability**

24.1    Every provision of this License Agreement is intended to be severable.  The validity or enforceability of any provision or provisions hereof shall not affect the validity or enforceability of any other provision of this License Agreement.

**Article XXV.  Further Documents**

25.1    Each of the parties agree to execute and deliver all such documents and to do any and all acts, matters and things as may be necessary or proper in order to carry out the intent and purpose of this Agreement.

**Article XXVI.  Governing Law and Venue**

26.1    This License Agreement has been entered into in the State of North Carolina and shall be construed and enforced in accordance with the laws of the State of North Carolina.  The parties agree that any action brought concerning or relating to this Agreement shall be commenced in the State of North Carolina.

25

**Article XXVII.  Notices**

27.1    All notices, consents, approval or other notification required by this Agreement shall be in writing.  Any such notice shall be deemed served if sent by any mail to the attention of the person designated herein or subsequently designated by appropriate notice at the address given below:

**Licensor:**

LM Restaurants, Inc.
Mr. Lou Moshakos, President
5404 Hillsborough Street
Raleigh, NC 27606-1339

**Licensee:**

Boynton Carolina Ale House, LLC
365 N. Congress Ave.
Boynton Beach, FL  33426

**Principal Owner of Licensee:**

John Politis, Member
365 N. Congress Avenue
Boynton Beach, FL  33426

**Article XXVIII.  Entire Agreement**

28.1    The foregoing Agreement constitutes the entire Agreement between the parties and may not be modified except by writing duly executed by all the parties.  There are no representations, promises, warranties, covenants, or undertakings other than those contained in this Agreement, which represent the entire understanding of the parties.

26

IN WITNESS WHEREOF the parties hereto have executed this

Agreement on the day and year first above written.

**Licensor:**

LM RESTAURANTS, INC.

By: _____
   Lou Moshakos, President

Date: _10/4/07_

**Licensee:**

Boynton Carolina Ale House, LLC

By: _____
   John Politis, Member

Date: _10-4-07_

27

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Civil No.:

MILLER'S ALE HOUSE, INC.

      Plaintiff,

vs.

BOYNTON CAROLINA ALE HOUSE, LLC.

      Defendant.

_____/

## DECLARATION OF MARK A. PETERSON

MARK A. PETERSON, being duly sworn, states under oath as follows:

    1. He is the Chief Financial Officer of Plaintiff Miller's Ale House, Inc., and he is of lawful age and competent to testify as to the following based on his own personal knowledge except where otherwise stated. Where facts are stated on information and belief, he believes those facts to be true.

    2. He has read the Complaint in this lawsuit. The facts in each of paragraphs 2, 4, 5, 8-18, 20-47 and 69 are true. The facts in paragraph 19 are, on information and belief, believed to be true.

    3. Plaintiff is the owner of a well known chain of restaurants/sports bars, operated under a family of marks comprised of a geographic prefix followed by the term "ALE HOUSE". Defendant is, based on a license agreement he has seen, a licensee of LM Restaurants of North Carolina.

4. In April 2008, Defendant opened a sports bar just about one mile from Plaintiff's BOYNTON ALE HOUSE sports bar location in Boynton Beach, Palm Beach County, Florida. Defendant consistently uses the geographic prefix Carolina in extremely small type so that Defendant's location appears as Carolina ALE HOUSE on Defendant's, menus, business cards and coupons. In late 2008, he first learned that Defendant may be in the process of opening another sports bar just about one mile from Plaintiff's DAVIE ALE HOUSE sports bar location in Davie, Broward County, Florida.

5. A lawsuit was filed in December 2008, in Palm Beach County (Florida) state court by Plaintiff against Carolina ALE HOUSE. In response, LM Restaurants commenced proceedings in Federal Court in North Carolina to stop Plaintiff from proceeding with the Palm Beach County lawsuit. LM Restaurants is identified as the Licensor of Defendant. In the North Carolina suit, a copy of a License Agreement between LM Restaurants and Boynton Carolina (Defendant in this lawsuit) was filed with the Court. A copy of that License Agreement is attached as Exhibit 7 to a Kirk Humphreys Declaration.

6. Paragraph 17.4 on page 21 of Exhibit 7 contains a provision that the Defendant will not "use the words 'Ale House' in any trademark, brand, or good (sic) or service description for ten (10) years after the termination date of this Agreement". He first learned of this License Agreement in early May 2009.

7. Plaintiff is a Delaware Corporation that owns and operates a chain of 47 restaurants/sports bars. Plaintiff opened its first restaurant/sports bar in Jupiter, Palm Beach County, Florida in 1988, under the name JUPITER ALE HOUSE. The prefix "Miller's" was also used but the word Miller's was, and continues to be used in a substantially smaller type such as "Miller's" on printed material such as business cards, menus, and advertisements.

8. Plaintiff now owns and operates five restaurants/sports bars in Palm Beach County, Florida. These restaurants/sports bars all use ALE HOUSE normally preceded by a single word geographic prefix. These locations are Boynton Ale House in Boynton Beach; Jupiter Ale House in Jupiter; Gardens Ale House in Palm Beach Gardens, Boca Ale House in Boca Raton, and East Boca Ale House in Boca Raton, although the East Boca Ale House was only recently opened.

9. Plaintiff owns and operates 37 other restaurants/sports bars throughout Florida in addition to the 5 referred to above in Palm Beach County. The Florida locations include Ft. Lauderdale, Davie, Coral Springs, Hollywood, Jensen Beach, Miami, Orlando, Altamonte Springs, Orange Park, Winter Park, Pembroke Pines, Ocala, Daytona, Gainesville, Jacksonville, Pensacola, Tallahassee, Brandon, Ft. Myers, Lakeland, Naples, Sarasota, St. Petersburg and Tampa. Each of Plaintiff's locations uses ALE HOUSE with a geographic prefix, which typically is either the actual geographical name of the municipality or a suggestive name such as "Boynton" instead of Boynton Beach.

10. Plaintiff uses the term ALE HOUSE with a geographic prefix as a family of trademarks ("Plaintiff's Family of Marks") and separately uses a logo on its printed documents such as menus and business cards. In the logo, the word ALE HOUSE predominates and is preceded by the word "Miller's" in substantially smaller type.

11. On buildings where Plaintiff's sports bars are located, *e.g.*, Boynton Beach, the sign on the building is BOYNTON ALE HOUSE, that is, within Plaintiff's Family of Marks.

12. In the case of the Boynton Ale House, only the words ALE HOUSE are visible when the exterior of the restaurant/sports bar is viewed from certain angles.

13. Plaintiff has five restaurants/sports bars outside of Florida, specifically, in Georgia, Illinois, New York and Pennsylvania.   Plaintiff's advertising extends into all these states.  Plaintiff has take-out or "to-go" menus which list all 47 locations, and various menu items are identified as "Ale House", *e.g.*, "Ale House Burgers".

14. Plaintiff has made a substantial effort to make ALE HOUSE and ALE HOUSE with a geographic prefix known throughout Florida and elsewhere including printed media advertising, internet (www.millersalehouse.com) etc.

15. In addition, Plaintiff has promoted its name throughout Palm Beach County by sponsoring sports teams at various schools, local little league teams, local adult softball teams, high school teams, high school bands, sponsoring an autism benefit, sponsoring Sunfest (the annual start of summer festival in West Palm Beach), advertised on local radio stations, national girls softball tournaments, grand slam fishing tournament, and advertises in the "Clipper" Magazine with coupons offering a $5 discount for a $25 purchase.

16. In the past, Plaintiff has been an official sponsor of the Florida Marlins Major League Baseball team and the Miami Dolphins National Football League team.

17. In addition to the name, Plaintiff has developed an overall visual appearance or impression for its ALE HOUSE restaurants/sports bars and has used this overall visual appearance or impression consistently throughout its family or chain of ALE HOUSE restaurants/sports bars.

18. To his knowledge, the Defendant began operating its Ale House in Palm Beach County, Florida, in the second quarter of 2008, just over one mile from and on the same street as Plaintiff's BOYNTON ALE HOUSE location.

19. He has compared the sales at the Plaintiff's five locations in Palm Beach County, Florida to determine if the opening of Defendant's restaurant/sports bar has had any impact on sales at Plaintiff's restaurants/sports bars. To make this comparison, he looked at the sales during each calendar quarter and compared the sales to the corresponding calendar quarter for the prior year. Thus he compared the first quarter 2008 sales to the first quarter 2007 sales, the second quarter 2008 sales to the second quarter 2007 sales, etc.

20. In 2008, consistent with the problems in the United States economy, there was a general downturn in the total comparable store revenue generated at Miller's Ale House restaurants/sports bars and such downturn was a reduction in total revenues of the Ale House comparable restaurants of 2%. In general, most restaurants experiencing a decline were in the single digit range. At Miller's Boynton Beach Ale House, the downturn was similarly in the single digits each month until May 2008, when the reduction in revenue dramatically increased to double digits (mid to upper teens). The monthly decrease in revenue at that restaurant/sports bar between May 2008 and December 2009, was between 11% and 19% from prior year's revenue. I am informed and believe that the Boynton Beach Carolina Ale House opened for business in April 2008, the following month that the revenue decrease described above increased to double digits.

21. He also compared sales at the Plaintiff's Palm Beach County locations other than Boynton Beach on the same basis, that is, the first quarter of 2008 compared to the corresponding first quarter of 2007, second quarter of 2008 to the second quarter of 2007, etc. The purpose of this comparison was to determine the impact of the economy on sales at Plaintiff's restaurants/sports bars.

22. As an example, during the first quarter of 2008, sales at all Plaintiffs restaurants/sports bars in Palm Beach County were down approximately 5.2% from the comparable quarter in 2007.

23. During the second quarter of 2008, which is when Defendant began its business operations, sales at the Plaintiff's four Palm Beach County restaurants/sports bars other than Boynton were down about 6.5% compared to 2007. However, sales at Plaintiff's Boynton Ale House were down 12.2% compared to 2007. It would be logical to attribute 6.5% of this 12.2% drop in sales to the impact of the economy and the remaining 5.7% to the loss of business based upon confusion since Defendant opened its restaurant/sports bar.

24. During the third quarter of 2008, sales at Plaintiff's Palm Beach County restaurants/sports bars other than Boynton were down 3.6% compared to the third quarter of 2007, but sales at Plaintiff's Boynton location were down 17.6%. It would be appropriate to attribute 3.6% to the changing economy and 14% of the loss sales to confusion since Defendant opened its restaurant/sports bar.

25. Following this identical methodology, Plaintiff's Palm Beach County locations other than Boynton had a 1.7% gain in sales during the fourth quarter of 2008 compared to the fourth quarter of 2007, but the Boynton location had a 15.4% drop in sales.

26. During the first quarter of 2009, Plaintiff's Palm Beach County locations other than Boynton had a 1.1% decrease in sales compared to the first quarter of 2008, but Plaintiff's Boynton location had a 7.9% drop in sales.

27. He is aware of instances of actual confusion between Plaintiff's operation and Defendant's operation. For example, Plaintiff received a resume from an individual named Rick Vaughan seeking employment at Plaintiff's Raleigh, North Carolina location. Plaintiff

does not have any such location but there is a Carolina Ale House, which he believes is owned and/or operated by the licensor of Defendant, in Raleigh, North Carolina. A copy of the e-mail correspondence regarding the confusion is attached as Exhibit 9.

28. Plaintiff carries certain insurance through Hartford. Recently, Hartford sought to process a claim against Plaintiff's insurance policy when, in fact, the incident did not occur at any of Plaintiff's locations but apparently occurred at a Carolina location. A copy of the e-mail correspondence regarding the confusion is attached as Exhibit 10.

29. Plaintiff uses the ALE HOUSE  with a geographic prefix trademark and, in addition, has Florida State Trademark Registrations for Miller's Ale House (Trademark Registration T20021136), Jupiter Ale House and Raw Bar and design (Trademark Registration T14907), Boynton Ale House and Raw Bar and design (Trademark Registration T14909), Boca Ale House and Raw Bar and design (Trademark Registration T 9400001388), and Ale House and Raw Bar and design (Trademark Registration T15005) all of which were registered prior to 2008.

30. Plaintiff has also filed for Florida State Trademark Registrations for the following marks that follow the same format: Boca East Ale House, Boca West Ale House, Coral Springs Ale House, Davie Ale House, Doral Ale House, FT. Lauderdale Ale House, Gardens Ale House, Hollywood Ale House, Jensen Ale House, Kendall Ale House, North Miami Ale House and Pines Ale House.

31. Plaintiff obtained Copyright Registration No. VAu000434206 as part of a series of floor plans protected for its restaurants/sports bars. See Exhibit 16. The Carolina Ale House in Boynton Beach, Florida bears an unmistakable resemblance to the floor plan covered by this Registration.

Further declarant sayeth not.

Executed at Jupiter, Florida
under penalty of perjury
this 19ᵗʰ day of June, 2009

Mark A. Peterson

Page 8 of 8

# EXHIBIT 9

**From:** Val Ensinger [mailto:vensinger@millersalehouse.com]
**Sent:** Monday, May 04, 2009 8:41 AM
**To:** Rodman Steele
**Subject:** FW: Rick Vaughan resume

Another instance of confusion.  See below. Thanks.

---

**From:** Susan Pastine
**Sent:** Monday, May 04, 2009 8:40 AM
**To:** Rick
**Cc:** Val Ensinger
**Subject:** RE: Rick Vaughan resume

We are not affiliated with that organization

*"Have a SUPER day!"*
*Susan Pastine*
*Director Recruitment/Training*
*Miller's Ale House*
*561-743-2299 X 212*
*Fax 561-354-4346*
*millersalehouse.com*

---

**From:** Rick [mailto:tarheelman1@comcast.net]
**Sent:** Saturday, May 02, 2009 21:07
**To:** Susan Pastine
**Subject:** Rick Vaughan resume

I will be moving to the raleigh NC area in 2 weeks.  I did talk to the general manager at the ale house in wake forest.  He did take my resume.  Hope to be hereing from you very soon.
                    Thank you
                    Rick Vaughan

# EXHIBIT 10

**From:** Val Ensinger
**Sent:** Friday, January 23, 2009 10:16 AM
**To:** 'Steele, Rodman'
**Cc:** 'jmccann@akerman.com'
**Subject:** FW: GL 8373056 Sharon Pike

See below for another instance of confusion.  Someone working for the Carolina Ale House reported an accident to the Hartford (which is our insurance comany).  Perhaps Carolina AH is also an insured of Hartford.  Even our own insurance company is confused.  Thanks and have a great weekend!
Val

Valerie Ensinger, Administrative Assistant
MILLER'S ALE HOUSE, INC.
612 North Orange Avenue, Suite C
Jupiter, Florida  33458
Telephone:  (561)743-2299 ext. 302
Direct:  (561)354-2516
Fax:  (561)354-2517

**From:** Fox, Keven (CLAIM, Claims) [mailto:Keven.Fox@thehartford.com]
**Sent:** Friday, January 23, 2009 7:44 AM
**To:** Val Ensinger
**Subject:** GL 8373056 Sharon Pike

Valerie:

New GL claim assigned to me.  This occurred at 4512 Falls of Neuse, Raleigh, NC 27609.   I do not find this location on the listing in the acct service agreement.  Do you know the location code for this location?  Loss date 11/15/08.

Keven Fox
Claims Consultant
Claims Plus Team
Hartford Insurance Company
PO Box 14263
Lexington, KY 40512-4263
Fax 866-809-1178
Phone  888-525-2652 x27421
keven.fox@thehartford.com

*************************************************************
This communication, including attachments, is for the exclusive use of addressee and may contain proprietary, confidential and/or privileged information.  If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited.  If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.
*************************************************************



# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Civil No. _____

MILLER'S ALE HOUSE, INC.

      Plaintiff,

vs.

BOYNTON CAROLINA ALE HOUSE, LLC.

      Defendant.

_____/

## DECLARATION OF MITCHELL KOENIG

Mitchell Koenig, declares as follows:

      1.     He is a resident of Tequesta, Florida, 41 years old and competent to make this declaration.  He makes make this declaration in support of Plaintiff in connection with this lawsuit.

      2.     He is a Regional Manager for Miller's Ale House, Inc., a Delaware corporation having a chain or family of 47 restaurants/sports bars in Florida and additional restaurants/sports bars in several other states.  Most of Plaintiff's restaurants/sports bars use a single geographic prefix with the term ALE HOUSE, such as JUPITER ALE HOUSE.  Several of Plaintiff's restaurants/sports bars have a single geographic suggestive prefix with the term ALE HOUSE, such as GARDENS ALE HOUSE, BOCA ALE HOUSE and BOYNTON ALE HOUSE.  This approach is followed throughout the family of restaurants/sports bars.  The Plaintiff consistently uses the term "ALE HOUSE" with a geographic prefix as a trademark for its family of restaurants/sports bars.

Page 1 of 14

3.      He has been in the restaurant management business for over 20 years and began managing a restaurant/bar when he was 18 years old.

4.      He has worked for Plaintiff or its predecessor for 11 years and has been managing restaurants/sports bars for Plaintiff or its predecessor for about 7 years.

5.      As a Regional Manager for Plaintiff he has responsibility for the operations of seven of the Plaintiff's restaurants/sports bars in South Florida, including all the Plaintiff's restaurants/sports bars in Palm Beach County. The BOYNTON ALE HOUSE restaurant/sports bar in Boynton Beach, Florida is one of the restaurants/sports bars for which he has responsibility.

6.      In his role as Regional Manager, he normally visits the BOYNTON ALE HOUSE restaurant/sports bar on an average of twice per week.

7.      Carolina Ale House opened a restaurant/sports bar in Boynton Beach, Palm Beach County, Florida in April 2008.  This Carolina Ale House is about 1.3 miles away from the Boynton Ale House restaurant/sports bar in Boynton Beach.

8.      He will first describe certain similarities as between the Boynton Ale House restaurant/sports bar and the Carolina Ale House and then describe numerous instances of actual confusion.

9.      In describing similarities, he recognizes that both Boynton Ale House and Carolina Ale House fall into a category of restaurants known as "sports bars" and, therefore, certain similarities such as a bar per se, multiple televisions displaying sporting events and certain menu items, such as appetizers, soups, salads, sandwiches including burgers, other main courses such as steaks and seafood, and beverages including soft drinks and beer, would be expected at all sports bars including Boynton Ale House and Carolina Ale House.

10.    Thus he will only address certain similarities as between Boynton Ale House restaurant/sports bar and Carolina Ale House which he has not found in other sports bars in general and certainly not within Palm Beach County, Florida.

a. A first similarity is the use of "Ale House" in red letters on the front of the menu. Many other colors could be used. He has not seen the name of the sports bar in red letters on the front of the menu for any other establishment. (In this regard, he notes that Plaintiff uses red and yellow lettering, not just red.)

b. A second similarity is the use of ALE HOUSE as the prominent words on the front of the menu, with "Miller's" and "Carolina" being in substantially smaller type.

c. A third similarity is the use of "Ale House" to specify certain menu items. Plaintiff's menu offers "Ale House Loaded Fries", "Ale House Combo", and "Ale House Mini Burgers" all without the word "Boynton" or "Miller's". Carolina's menu offers "Ale House Chili Nachos", "Ale House Onion Strings", "Ale House Reuben", "Ale House Salad", "Ale House Blackened Cheeseburger", "Ale House Chili", "Ale House Salad", "Ale House Chili Cheddar Cheeseburger", "Ale House Mud Pie" and "Ale House Mac & Cheese" all without the word "Carolina".

d. A fourth similarity is the extremely limited use of the additional word "Miller's" or "Carolina" to specify menu items. Boynton Ale House restaurant/sports bar's menu offers only two such items: "Miller's Cajun Mahi Pasta" and "Miller's Steak Sandwich"; Carolina's menu also offers two such items, a "Carolina Hurricane" and a "Carolina Ale House Sandwich".

Page 3 of 14

e. A fifth similarity is that neither restaurant/sports bar uses "Ale House" plus the additional word "Miller's" or "Boynton" or "Carolina" to identify any menu item.

f. A sixth similarity is the apparel worn by the servers. Plaintiff's restaurant/sports bar's servers wear a dark (typically black) pullover "polo" type shirt with khaki shorts or slacks, and Carolina's servers wear a dark (typically black) pullover "polo" type shirt with khaki shorts or slacks. Recently, Carolina added dark burgundy and dark green pullover "polo" type shirts. While uniforms are common at restaurants including sports bars, to his knowledge no other Palm Beach County sports bar uses the "dark top/khaki bottom" combination.

g. A seventh similarity is the general footprint or arrangement of the restaurant interior. Boynton Ale House restaurant/sports bar – which together with the other restaurants/sports bars owned and operated by Plaintiff uses a trademark consisting of a geographic prefix with the term "Ale House"—uses an open approach, with a bar in the center, an open kitchen appearance, "high-top" tables on the right hand side (as you enter the restaurant/sports bar) a certain soffit over the bar, and "dock wood" on the walls. ("Dock wood" refers to a certain type of wood which is typically found at piers and docks.) Carolina uses the same open approach, with a bar in the center, an open kitchen appearance, "high-top" tables on the right hand side (as you enter the restaurant/sports bar) a certain soffit over the bar, and "dock wood" but only ½ way up the walls. To his knowledge no other sports bar or sports bar chain, let alone other sports bars in Palm Beach County, uses this combination to create a consistent look and feel in their sports

bars. While he may have seen some of these items individually in a sports bar which is part of a chain, the other sports bars in that chain do not include these items and therefore these items have not, to his knowledge, been used to develop a theme or a "look and feel" by any other sports bar.

h. An eighth similarity is the use of "ALE HOUSE" in large letters in red on the outside of the building.

i. A ninth similarity is the extremely limited availability of "ales" at either Plaintiff's restaurants/sports bar or Carolina's restaurant/sports bar. For example, Boynton Ale House restaurant/sports bar offers 27 varieties of draft beer and only 2 draft ales, and 28 varieties of bottled beer but no bottled ale. Carolina offers 33 varieties of draft beer with 3 draft ales, and 37 varieties of bottled beer with no ales.

11.     He will now describe instances of actual confusion as between Plaintiff's Ale House restaurant/sports bar and Carolina Ale House.

12.     He is personally aware of and has personally witnessed instances of confusion between Boynton Ale House restaurant/sports bar and Carolina Ale House. The confusion began immediately after the Carolina Ale House opened in April 2008 and continues to this day without diminishing.

13.     In order to track some of this confusion, he instructed the staff at Boynton Ale House restaurant/sports bar to maintain log books of instances of confusion maintained. He directed the employees at the Boynton Ale House restaurant/sports bar to keep a written record of any instances of confusion that they witnessed or of which they became aware of, with the entries to be made in the log book as close as possible to the time they occurred. However, he is

aware from speaking with the employees that not all instances of confusion have been entered into the books and further that all entries are not necessarily made on the day that the incident occurred.  He has attached a copy of the log book for the interval of approximately September through December 2008 as Exhibit 12.  He has additional logs for the more recent time frame.

14.    The instances of actual confusion can be placed generally into four basic categories, namely, suppliers, customers, job applicants, and "coupons".

15.    <u>Supplier Confusion:</u>

    a. Starting first with "suppliers", on September 10, 2008, he went to an Office Depot store to purchase log books.  He was wearing his own logo shirt, a "polo" shirt with a "Miller's Ale House" logo.  The sales clerk named Angela asked how our Carolina Ale House was doing.  He responded that he was with "Miller's Ale House" restaurant and the clerk replied "Isn't that the Carolina Ale House"?  This entry may be found on the first page of Exhibit 12, dated 9-10-08.

    b. There is an alcoholic beverage called "Kahlua" and the manufacturer or the manufacturer's representative sponsored a promotion.  As part of the promotion a group of young ladies ("Kahlua girls") came to the Boynton Ale House restaurant to give away free "shots" of Kahlua .  It took about 30 minutes before these representatives understood that they were supposed to be at the Carolina Ale House.  (See, Exhibit 12, page 1, entry dated 9-13).

    c. Boynton Ale House restaurant/sports bar receives deliveries from its local beer distributor one or two timer per week.  On September 30, 2008, the local distributor "Gold Coast" attempted to deliver the Carolina Ale House beer order

to the Boynton Ale House restaurant/sports bar.   (See, Exhibit 12, page 6, 9/30/09 entry).

d. As recently as April 2009, there was confusion by the manufacturer and/or distributor of Samuel Adams Beer.  According to the e-mails which are attached as Exhibit 13, Samuel Adams Beer was having a national promotion and wanted posters placed at the Boynton Ale House restaurant.  Samuel Adams Beer went through its Miami, Florida District Manager on April 10, 2009, to have banners/posters at the Boynton Ale House restaurant and included a copy of the e-mail to the distributor, Gold Coast Beverage.  When Gold Coast Beverage (Tom Longo) contacted Boynton Ale House restaurant to obtain approval to place the posters at Boynton Ale House restaurant, he learned that Boynton Ale House restaurant had no knowledge of the Samuel Adams promotion.  Then, Samuel Adams Beer Company and its Florida District Manager and Gold Coast Beverage admitted the confusion (e-mail of April 15, 2009 at 4:48 PM, part of Exhibit 13).

16.    <u>Customer Confusion:</u>

The following are 31 instances of actual confusion <u>at the Boynton Ale House</u> location in a three+ month interval, with most instances involving multiple customers:

a. A couple came to Boynton Ale House restaurant for a party and the rest of the party went to Carolina by mistake (Exhibit 12, page 1, 9/5/08);

b. Customer called but wanted Carolina and asked for the phone number of Carolina (Exhibit 12, page 1, 9/16/08);

c. Customer came into meet their party but the rest of the party was at Carolina (Exhibit 12, page 2, 9/23/08);

d. Twice customers called Boynton Ale House restaurant asking if the Boynton Ale House restaurant was the new Ale House (Exhibit 12, page 3, 9/23/08);

e. Customers came to Boynton Ale House restaurant thinking it was Carolina (Exhibit 12, page 3, 9/24/08);

f. Customer thought that Carolina Ale House belong to Boynton Ale House restaurant (Exhibit 12, page 3, 9/25/08);

g. Customer asked if Boynton Ale House restaurant and Carolina were affiliated (Exhibit 12, page 4, 10/15/08);

h. Two customers came to Boynton Ale House restaurant to meet friends who were at Carolina (Exhibit 12, page 5, 9/28/08);

i. Customer asked where the other Ale House restaurant was, what it was called, and then asked why both had the same name (Exhibit 12, page 5, 9/28/08);

j. Customer had heard that Boynton Ale House restaurant and Carolina were the same (Exhibit 12, page 6, 10/1/08);

k. Customer came to Boynton Ale House restaurant to meet her party which was at Carolina (Exhibit 12, page 6, 10/1/08);

l. Customer called thinking Boynton Ale House restaurant was Carolina and asked how long we had been at the location (Exhibit 12, page 7, 10/6/08);

m. Customer called asking if Boynton Ale House restaurant had moved down the street (Exhibit 12, page 8, 10/12/08);

n. A group of 10 ladies were meeting for lunch and some of the party went to Carolina (Exhibit 12, page 8, 10/13/08);

o. Customer called asking for the phone number of our other store on Congress (Exhibit 12, page 9, 10/13/08);

p. Customer showed up to meet her friend who was at Carolina (Exhibit 12, page 9, 10/18/08);

q. Twice customers came to pick up "To Go" or "carry out" orders after placing the orders at Carolina (Exhibit 12, page 9, 10/18 and 10/13/08);

r. Customer came in looking to meet a guest and one of them was at the wrong restaurant (Exhibit 12, page 10, 10/29/08);

s. Four guests asked if Boynton Ale House restaurant was the same as Carolina (Exhibit 12, page 11, 11/5/08);

t. Customer called to complain about double credit card billing and ultimately it was determined that she was trying to reach Carolina (Exhibit 12, page 11, 11/8/08);

u. Customer called to complain that her daughter was harassed the night before at the bar because some other customers walked out without paying their bill and the daughter was threatened that the police would be called if she did not pay their bill – after further discussion with the Customer it was determined that the incident occurred at Carolina because the time of the incident was after Boynton Ale House restaurant had closed for the evening (Exhibit 12, page 14, 11/3/08);

v. Customer who had been coming to Boynton Ale House restaurant for years thought that Carolina was Miller's (Exhibit 12, page 15, 11/15/08);

w. Customer called to complain that her credit card was charged three times – after discussion customer realized she had called Boynton Ale House restaurant instead of Carolina (Exhibit 12, page 16, 11/14/08);

x. While waiting for a table, customer asked if the Congress restaurant and the Boynton Ale House restaurant were affiliated (Exhibit 12, page 17, 11/23/08);

y. Customer came in asking if Boynton Ale House restaurant was the location where the Corvette club had its meeting  which it was not (Exhibit 12, page 17, 12/1/08);

z. Customers complained that when eating at Carolina, they thought it was Boynton Ale House restaurant and were unhappy with the food and service (Exhibit 12, page 17, 12/2/08);

aa. Customer called asking for directions but wanted directions to the Carolina location (Exhibit 12, page 18, 12/3/08);

bb. Customers called asking for Carolina (Exhibit 12, page 18, 12/11 and 12/17/08);

cc. Customer came in to meet others  but didn't know if it was the right place – the others were at Carolina (Exhibit 12, page 19, 12/19/08);

dd. Customer came in to order a "signature Carolina Ale House sandwich".  That term appears on the Carolina menu but not on the Boynton Ale House restaurant menu (Exhibit 12, page 20, 12/21/08);

ee. Customer came into Boynton Ale House restaurant asking for directions to our "new Carolina Ale House" (Exhibit 12, page 20, 12/24/08);

17.    <u>Job Applicant Confusion:</u>

Page 10 of 14

a. Potential employee called for a job and though Boynton Ale House was Carolina (Exhibit 12, page 2, 9/16/08);

b. Potential employee came in to fill out application and said she filled out an application at our other location [on Congress] (Exhibit 12, page 10,10/21/08) which is the Carolina Ale House location;

18.   Coupons:

a. Both Boynton Ale House restaurant/sports bar and Carolina apparently place discount coupons in various media such as Clipper Magazine. The coupons as printed offer a discount of "$5.00 off your check of $25 or more" or "$10.00 off your check of $50.00 or more". There are two different coupons, one for each amount.  A copy of the Defendant's coupons is attached as Exhibit 14.

b. The Carolina coupons all state: "Valid at participating Palm Beach Area Locations". However, Defendant has only one Palm Beach County Location.  He does not know if this was printer confusion/mistake in referring to "locations" (plural), or the advertising company's confusion/mistake in referring to "locations" (plural) or someone else's confusion/mistake or deliberate on the part of Defendant.

c. It should be noted that the coupons have the Carolina Ale House name on them. However, many customers have sought to redeem these coupons at Miller's Ale House restaurants/sports throughout Palm Beach County as far north as Jupiter, and Plaintiff honors those coupons for customer goodwill.   The following

instances of confusion occurred at the Boynton Ale House restaurant/sports bar location.

d. Customer tried to redeem Carolina Ale House coupon (Exhibit 12, page 4, 9/25/08);

e. Customer tried to redeem Carolina Ale House coupon (Exhibit 12, page 7, 10/4/08);

f. Customer asked if she could use the coupon and indicated she did not know that Carolina was different (Exhibit 12, page 10, 10/18/08);

g. Two guests asked for the prime rib and asked if it was Carolina because they had coupons (Exhibit 12, page 1, 10/30/08);

h. Customers tried to use gift card for Carolina at Boynton Ale House restaurant (Exhibit 12, page 13, 11/12/08);

i. Customer attempted to use coupon (Exhibit 12, page 14, 11/14/08);

j. Customer attempted to use Carolina coupon (Exhibit 12, page 19, 12/20/08).

19. Plaintiff uses the ALE HOUSE with geographic prefix trade mark format throughout its restaurants/sports bars.

20. The geographic prefix is typically, but not necessarily, the name of the city or suggestive of the city in which the particular restaurant is located.  For example, Jupiter Ale House in Jupiter, Florida and Boynton Ale House in Boynton Beach, Florida.

21. In the vicinity of each of our restaurants/sports bars, the public typically refers to Plaintiff as the "ALE HOUSE."

22. Identical to Plaintiff, the Defendant uses ALE HOUSE with the geographic prefix of CAROLINA.

23. The geographic prefix CAROLINA appears in substantially smaller typeface compared to ALE HOUSE in all uses by Defendant of which he is aware.

24. For instance, the Carolina Ale House in Boynton Beach, Florida has an exterior sign that emphasizes the words ALE HOUSE over the word CAROLINA.  These words are colored red, the same color as the letters in the exterior signage at Plaintiff's BOYNTON ALE HOUSE restaurant/sports bar.

25. Further, the Carolina Ale House corporate logo on business cards displays the term ALE HOUSE prominently in comparison to other words that appear in the logo.

26. Overall, the appearance and impression of Plaintiff's ALE HOUSE with geographic prefix trademark and Defendant's ALE HOUSE with geographic prefix trademark are the same.

27. Plaintiff's ALE HOUSE with geographic prefix trademark and Defendant's ALE HOUSE with geographic prefix trademark are used in connection with exactly the same goods and services.

28. Specifically, Plaintiff's ALE HOUSE with geographic prefix trademark and Defendant's ALE HOUSE with geographic prefix trademark are both used in connection with casual, sports bar style restaurant chains, which offer American fare at moderate prices.

29. Plaintiff's Ale House restaurant/sports bar and Defendant's Ale House offer their products and services in restaurants (*e.g.*, sports bar) which are the same type of retail outlet.

30. Plaintiff has operated its restaurant/sports bar at 2212 North Congress Avenue, Boynton Beach, Florida for 18 years.

31. In early 2008, Defendant opened a restaurant/sports bar at 365 North Congress Avenue, Boynton Beach, Florida, approximately 1.3 miles from Plaintiff's Boynton Beach Ale House restaurant/sports bar.

32. Both the Plaintiff's restaurant/sports bar and the Carolina Ale House restaurant/sports bar target the same or similar prospective customers, namely, persons who patronize sports bars and are generally from college age to senior citizens.

33. Other restaurants have opened near the Plaintiff's BOYNTON ALE HOUSE restaurant/sports bar around the time Carolina Ale House opened in Boynton Beach, but he is not aware of any such restaurants being sports bars or using a trademark consisting of a geographic prefix with the term "Ale House".

34. Carolina Ale House has copied Plaintiff's promotions. For instance, Plaintiff started *Ladies Drink Free on Thursday Nights* in early 2008 and Defendant began offering the same promotion on Thursday nights approximately one month after Defendant opened its restaurant/sports bar.

Further declarant sayeth not.

Executed at Jupiter, Florida
under penalty of perjury on
this 19th day of June, 2009

Mitchell Koenig

Page 14 of 14

# EXHIBIT 12

mk—

9-10-08 | I was just in office depot and a nice wall warmed Angela who rang me saw my logo on my shirt she said "Hows Your Carolina Ale House Doius" I replied we are the Millers Ale House she said oh "Isn't that the Carolina Ale House?" I replied no we are on Gateway Blvd
~~Colorate House~~ Mitchell Koenig

9-13 | Kahlua Rep girls came in to work and give away shots. Took them and us 30 min to understand what was going on, they were supposed to be at "Carolina Ale House". Camilla Dacunha

9-5 | Couple showed up for party for their work, rest of the party went to Carolina Ale house by mistake. Camilla Dacunha

9/16 | Woman called to ask which Alehouse we were. I explained that we're Miller's Alehouse on Gateway + Congress and she asked if I could give her the number to the other one on Boynton Beach Blvd. I told her we are not affiliated and I didn't know the number.
Christine Hite



9/16/08   Someone called in to see if we are hiring. Thought we were Carolina Ale House.
Danielle L.

9/19   While doing a table visit, a guest mentioned that we are the best sports bar, and actually said "he tells his friends not to go to Carolina b/c its NOT the same". He asked how they are able to use our name. He actually said "you should sue them!".
— Camilla Dacunha

9/23/08
A customer came in to meet a party, they were at Carolina Ale. Booo!
Danielle

9/23

A lady called asking if we were the New Ale House. I said no and she asked if we had the number. Also said no, then she hung up. Happened twice.

Erin O'Connor

Niki Westerman-Germain

9/24

People came up to door thought it was Carolina Ale House And left

Bear Atshot

9/25

Heard people out front talking about Carolina Ale House. Mentioned it wasn't one of ours b/c they thought it was.

9/25

My table tried to give me
a coupon for Carolina Ale House.
Thought we were the same
place

Carrie L.


10-15 - Guest asked if we were
affiliated with Carolina (other Ale House)

Shannon

9/28/08

Danielle had 2 guys show up to meet friends the other guys at Carolina Ale House.

9/28/08

Party behind hostess stand talking about Carolina Ale House, saying there's absolutely no affiliation, just happened to be called ale house
Rach L.

9/28/08

Man asked where the "other" Ale House was & then when I said on Congress he asked what it was called & then asked why we both had the same name.
Katie McKnight

9/30/08        11:43

Gold Coast Tried to Deliver
Carolina's Beer Order

10/1/08        around 5:30

While waiting, a customer asked if
we were the same restaurant as Carolina Ale,
When saying no, he said "that's not what
someone told me. I heard it was the same
thing."
                    —RS

10/1/08     7:07 pm

Lady asked if a "Heier"
was on the "list & said she
swore they were here
already. Then asked if there
was a Barnes & Noble in
the shopping plaza & I told
her no, she was at the wrong
Ale House. Then she asked
me how to get to the other
Ale House.
              — Katie

10-4

A guest called saying if we had an early bird special like Carolina from 2-5, I told her lunch specials on the week days, from 11-3.

Ernie

10/4/08

A guest tried to use a coupon from Carolina ale house thinking we were the same because it said the one on boynton.

Kristin K.

10/6

Someone called & thought we were Carolina Ale House asked how long we have been here & where we were located. Thought we were new ale house

Carrie L.

10/10

    5:20pm

    man called asking if we moved down congress
    I responded "no we are next to Chilis - we are
    not part of that resturant - different company"
       Chris

10/12/08 a former Employee OF ours
now works for Carolina, She
has people come in Carolina
asking about our Specials,
She Sends them here.
      Danielle

10/13/08   10 ladies are meeting for Lunch
    and some of the party was confused
    and went to Carolina Ale House.
      Nina

10/13/08

Guest called and asked for our phone # for the store located on the corner of congress and Old Boynton. 1:50 pm
Andrea S.


10-18-08
Lady showed up to meet her friend "at the ale house". Friend was at Carolina alehouse kids. planning


10/18/08
Customers (OTIS) came to pick up 100 wings. We had no ToGo orders In the system a waiting in the kitchen. Told them # must be "Carolina Ale House". Same thing happened than 10/13/08 @ night
Andrew 3:45p.

10-18-08

Lady showed up asking if she would able to use coupon on Sat night. It was for Caroline Ale She ~~total~~ thought is was Millers ale house coupon. Did not know it was a different place. P. Vannoy

10/19

Someone called thinking we were the Carolina Ale House.
Erin O'Connor

10/21

girl came in to fill out application and said she filled out one at our other location up the Road as well.
Jenny P

10/29

lady came in looking for a guest & said she was at the wrong location.
Pamela.

10/30

2 Guest came in and ask for
the prime rib, after coming
back to inform them that
the special is ready to order,
& to he asked if this was
Carolina, and the reason why
is because he had coupons.

11-5-08

four guests' leaving asked if
we were the same as
Carolina Ale House

Shannon

11/8/08

Lady called about a descrepency on her credit card bill (it was charged twice) The GM spent 15 minutes-30 minutes looking for + talking to the lady only to find out she was calling the wrong Ale House. Her problem was with Carolina Ale House.

—Kristin K.



11/12/08

Table tried to give me
a giftcard for Carolina Ale
House, then asked me where
there were located.

Carrie L.

11/3    lady called saying her daughter
was harrassed the night before bk
some guys walked on their bar
tab. She had been told the cops
would be called if the girl didnt
pay. It was only till the lady
informed me that this happened
on a Sunday night at approx.
1:30 am that I figured out
we close at midnight so I was
at Carolina.
                    —Camilla Dacunha


11/14
     A table ate dinner once recieved
the check, they tried to use a
$5.00 off coupon. Told them that
this was not Carolina Ale House.
                    Pamela Peifer

11-15-08

While doing a table visit, the couple was saying they have been coming here for years. The wife then said "I went to the one in Jacksonville" and the husband responded "No- they are millers" I said "WE ARE MILLERS". He then said "I thought the one down the road was millers" I explained "No, they are Carolina, WE are millers".
Even some guests who have been eating here for years are confused!!

— Camilla Dacunha



11-14  Woman called and said
that her credit card was charged
3 times. Said she didnt know why
it would be charged 3 different
times.. John looked through recepts
from given date and had no
record of her charge- She then
realized she had called the
wrong Ale House. Should have
called Carolina Ale House.

11/18
We had an "add" go out in the paper

11/23 — while waiting for table had
guest ask if ~~Car~~ the one
on congress is affiliated with
us — told them no — Carolina
— camilla

12/1
Women came in asking if this
was the Ale House that the corvett
club meets. She was looking for
Carolina Ale.
                    — Erin O'connor

12/2 -
A couple came in telling me
how they ate @ Carolina Ale House
b/c they thought it was our
store and stared talking about how
bad the service was and food was
bad.
                 Andreas.

12/3

A lady called asking for directions got confused when I told her it was on the corner of gateway and congress b/c she saw "The Ale House" corner by Baynton Beach Blvd.

Andrea S.

12/11

Someone called asking if we were the Carolina Ale House and I told them we were not affiliated with them and then proceeded to ask for the phone number and I told them again we were not affiliated w/ them.

Kristin K.

12/17

Lady called, mistaking us for Carolina Ale.

Rachel S.

12/19 A Lady came [crossed out] in and said she was meeting a bunch of people but didn't know if this was the right place — They were at Carolina Ale House.
— Kristin

12/20/08
man came in and said "Oh, you shouldn't have opened that new boynton Ale house!" (meaning Carolina) because you're slow right now
— Jenny

12/20 MaN caMe in trying to USe a Carolina coupon.
— EriN

12/21 Couple wanted a signature
Carolina Ale House Sandwich.

-Sheene-

12/24 man came in asking
for directions to our new
Carolina Ale House.

-Jenny

# EXHIBIT 13

**From:** Tom Longo
**Sent:** Wednesday, April 15, 2009 4:54 PM
**To:** 'Tischler, Rebecca'
**Subject:** RE: Sam Adams Ale House Feature

Not a problem, just wanted to make sure that we are all moving in the same direction.

The are 2 Carolina Ale Houses locations in the Gold Coast area, but I do not call on them. The best bet would be to contact Chris D. in Pompano, and Cal in Palm Beach or there DM's. They would be the ones to help you with this, and any signage needs you may have.

Moving forward if there is anything I can help you with please let me know.

**From:** Tischler, Rebecca [mailto:Rebecca.Tischler@bostonbeer.com]
**Sent:** Wednesday, April 15, 2009 4:48 PM
**To:** Tom Longo
**Subject:** RE: Sam Adams Ale House Feature

Tommy-

Sorry it took me a bit to get back to you but I had to get a hold of our National team. You were right it is the Carolina Ale Houses. I am SO sorry for this confusion & I asked that they be more specific next time because they just said Ale House & it was emailed to me directly making me think it was the Miller Ale houses.

I am sorry to put you in a position to where you had to speak to them about a non-existent program. My apologies, I hope you understand.

**From:** Tom Longo [mailto:tlongo@goldcoastbeverage.com]
**Sent:** Wednesday, April 15, 2009 10:53 AM
**To:** Tischler, Rebecca
**Cc:** Nick Procce; Heather McDonald; Mirta Angel; Victor Castro
**Subject:** RE: Sam Adams Ale House Feature

Rebecca,
I spoke with our friends at the Millers Ale House, and they have no knowledge of this program. Are you sure that you have the right Chain? There are also Carolina Ale Houses in our market, but only 1 in Broward and 1 in Palm Beach and non being in Miami.
Could you please find out which chain has this program and get back to me A.S.A.P.

Thanks,
TL.

**From:** Tischler, Rebecca [mailto:Rebecca.Tischler@bostonbeer.com]
**Sent:** Friday, April 10, 2009 10:20 AM
**To:** Tom Longo
**Subject:** FW: Sam Adams Ale House Feature

Hi Tommy-

Can you please take care of getting these signs done as the program has already started? I would love for one of our stores to win!!!

---

**From:** Nick Procce [mailto:nprocce@goldcoastbeverage.com]
**Sent:** Friday, April 10, 2009 10:17 AM
**To:** Tischler, Rebecca; Heather McDonald; Mirta Angel; Victor Castro
**Cc:** Tom Longo; Nick ProccA
**Subject:** RE: Sam Adams Ale House Feature

Rebecca,
 All signs for Ale House needs to go thru Tom Longo. Please reach out to him because he needs to get local approval and put the signs in frames.

Thanks
Nick

---

**From:** Tischler, Rebecca [mailto:Rebecca.Tischler@bostonbeer.com]
**Sent:** Friday, April 10, 2009 10:00 AM
**To:** Heather McDonald; Mirta Angel; Victor Castro
**Cc:** Nick Procce
**Subject:** Sam Adams Ale House Feature

Hey Guys!

There was a program set up Nationally with all the Ale Houses in FL. Below are the details:

- Sammy Saturdays (now until year end!)
- $3 Pints & $12 Pitchers ALL DAY EVERYDAY on Saturday
- There is a menu insert but due to the fact that several states are participating this will only have a picture of the Lager/Seasonal Pints (no price)
- There is an incentive for the region/store that sells the most Sam over LY in the timeframe of 4-1 thru 8-1
  - The winning state FL or SC wins a trip to Boston, along with the GM of the winning store

We need to make banners/posters for all the Ale Houses and Doug (the Ale House buyer) has suggested we do this through the wholesaler. Since the program started April 1, the sooner we can get these up the better. **Heather- Since you do the POS for Sam Adams can you please order posters for the stores?**

The GM's are all on board with the program and are competing against one another so any help we can throw their way is appreciated. I will try and get in all units this month to drop off some staff prizes.

Thank you for your help & Heather please let me know when these posters are finished so we can get to the reps ASAP to put up. I am sure this program will help us sell more beer & if any stores want the wooden stands or Lager POS the reps can count towards the Bingo cards! Thanks!

*Cheers!*
*Rebecca Tischler*

The Boston Beer Company
District Manager-Miami, FL
Office: (800) 372-1131 Ext. #5601
Cell: (520) 250-6530

**Do you want to learn more about our award-winning beers?...visit www.samadams.com**

---

This entire message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this message by mistake and delete this email from your system. Thank you.


Please consider the environment before printing this email!

**********************************************************************

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

# EXHIBIT 14



**ENJOY $5.00 OFF**
OF YOUR TOTAL CHECK OF
**$25.00 OR MORE**

VALID AT PARTICIPATING PALM BEACH AREA LOCATIONS
VALID THRU DECEMBER 2009



**ENJOY $10.00 OFF**
OF YOUR TOTAL CHECK OF
**$50.00 OR MORE**

VALID AT PARTICIPATING PALM BEACH AREA LOCATIONS
VALID THRU DECEMBER 2009

**ENJOY A FREE APPETIZER**
OF YOUR CHOICE WITH
THE PURCHASE OF A
FAVORITE ENTREE
($10.00 MAX VALUE)

VALID AT PARTICIPATING PALM BEACH AREA LOCATIONS
VALID THRU DECEMBER 2009

**ENJOY ONE LARGE
CHEESE PIZZA FREE WITH
THE PURCHASE OF A
LARGE CHEESE PIZZA**
($10.00 MAX VALUE)

VALID FOR EAT IN, TAKE OUT, OR DELIVERY OF TRATTORIA CAFE /
PIZZARIA ONLY. NOT VALID FOR FINE DINING
4580 DONALD ROSS VILLAGE • PALM BEACH GARDENS
(561) 932-0838
VALID THRU DECEMBER 2009

**ENJOY $5.00 OFF
YOUR TOTAL CHECK
WITH THE PURCHASE OF
$15.00 OR MORE**

VALID FOR EAT IN, TAKE OUT, OR DELIVERY OF TRATTORIA CAFE /
PIZZARIA ONLY. NOT VALID FOR FINE DINING
4580 DONALD ROSS VILLAGE • PALM BEACH GARDENS
(561) 932-0838
VALID THRU DECEMBER 2009

**ENJOY $10.00 OFF
YOUR TOTAL CHECK
WITH THE PURCHASE OF
$40.00 OR MORE**

VALID FOR EAT IN, TAKE OUT, OR DELIVERY OF TRATTORIA CAFE /
PIZZARIA ONLY. NOT VALID FOR FINE DINING
4580 DONALD ROSS VILLAGE • PALM BEACH GARDENS
(561) 932-0838
VALID THRU DECEMBER 2009



**ENJOY $5.00 OFF**
OF YOUR TOTAL CHECK OF
**$25.00 OR MORE**

VALID AT PARTICIPATING PALM BEACH AREA LOCATIONS
VALID THRU DECEMBER 2009



**ENJOY $10.00 OFF**
OF YOUR TOTAL CHECK OF
**$50.00 OR MORE**

VALID AT PARTICIPATING PALM BEACH AREA LOCATIONS
VALID THRU DECEMBER 2009

**ENJOY A FREE APPETIZER**
OF YOUR CHOICE WITH
THE PURCHASE OF A
FAVORITE ENTREE
($10.00 MAX VALUE)

VALID AT PARTICIPATING PALM BEACH AREA LOCATIONS
VALID THRU DECEMBER 2009

**ENJOY ONE LARGE
CHEESE PIZZA FREE WITH
THE PURCHASE OF A
LARGE CHEESE PIZZA**
($10.00 MAX VALUE)

VALID FOR EAT IN, TAKE OUT, OR DELIVERY OF TRATTORIA CAFE /
PIZZARIA ONLY. NOT VALID FOR FINE DINING
4580 DONALD ROSS VILLAGE • PALM BEACH GARDENS
(561) 932-0838
VALID THRU DECEMBER 2009

**ENJOY $5.00 OFF
YOUR TOTAL CHECK
WITH THE PURCHASE OF
$15.00 OR MORE**

VALID FOR EAT IN, TAKE OUT, OR DELIVERY OF TRATTORIA CAFE /
PIZZARIA ONLY. NOT VALID FOR FINE DINING
4580 DONALD ROSS VILLAGE • PALM BEACH GARDENS
(561) 932-0838
VALID THRU DECEMBER 2009

**ENJOY $10.00 OFF
YOUR TOTAL CHECK
WITH THE PURCHASE OF
$40.00 OR MORE**

VALID FOR EAT IN, TAKE OUT, OR DELIVERY OF TRATTORIA CAFE /
PIZZARIA ONLY. NOT VALID FOR FINE DINING
4580 DONALD ROSS VILLAGE • PALM BEACH GARDENS
(561) 932-0838
VALID THRU DECEMBER 2009

Lunches from $4.99

ICE COLD $2 PINT

**NOW OPEN**

**TUESDAY NIGHT — KIDS EAT FREE!**
*One free kids meal with purchase of adult entrée
LIVE ENTERTAINMENT FOR KIDS FROM 5 PM - 9 PM
SMOKER FRIENDLY PATIO DINING AREA
FREE WI-FI INTERNET

**OPEN 11AM-2AM EVERY DAY**

**WE SHOW ALL PAY-PER-VIEW EVENTS**
UFC • BOXING • COLLEGE GAMES • WWE • SOCCER

www.CarolinaAleHouse.com

365 N. CONGRESS AVENUE • BOYNTON BEACH, FL 33426 (JUST NORTH OF BOYNTON BEACH BLVD) (561) 735-7848
2618 WESTON ROAD • WESTON, FL 33331 (SE CORNER OF ROYAL PALM BLVD) (954) 217-1235

4580 DONALD ROSS VILLAGE
PALM BEACH GARDENS
(561) 932-0838





# EXHIBIT 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Civil No. _____

MILLER'S ALE HOUSE, INC.

        Plaintiff,

v.

BOYNTON CAROLINA
ALE HOUSE, LLC

        Defendant.

_____/

## DECLARATION AND EXPERT REPORT OF MICHAEL KARABAN

**Michael Karaban declares under oath as follows:**

    1.    He is over the age of 18 and competent to testify if called as an expert in this matter.  If called as a witness, he would testify to the following.

    2.    The precise format of this Declaration and Expert Report including numbering of the paragraphs was prepared by the offices of counsel for Plaintiff based on information which he provided (except where otherwise stated if any).  He then reviewed the entire document for accuracy prior to signing.

**Qualifications**

    3.    For over 35 years, he has been a strategic marketing, branding and advertising professional.  He retired in 2007 as Senior Vice President of Marketing for J&J Snack Foods Corp., Pennsauken, NJ after 17 years.  J&J Snack Foods is a manufacturer, marketer, and

distributor of an expanding variety of nutritional branded snack foods and beverages for the food service and retail supermarket industries, with annual sales revenues exceeding $600 million. J&J is best known for its SUPERPRETZEL brand soft pretzels, LUIGI'S Real Italian Ice, ICEE and SLUSH PUPPY frozen beverages and MINUTE MAID frozen desserts.

4.     He joined J&J in 1990 as Director of Marketing and was promoted to Vice President of Marketing in 1992 and Senior Vice President in 2001. His responsibilities included overall management of all corporate marketing, marketing and creative services, branding, marketing research, advertising, promotion, public relations and intellectual properties for all divisions including Food Service, Retail Supermarkets, The Restaurant Group and Frozen Beverages.  In addition, he was General Manager of the Retail Supermarket Division, a $50+ million dollar group, responsible for strategic direction, general management, and profit and loss. He managed planning, marketing, sales, and product development.

5.     He worked in conjuncture with The J&J Restaurant Group, which included Bavarian Pretzel Bakery and Pretzel Gourmet retail shops, developing and testing new product initiatives, and played a key role in assessing and approving all marketing elements such as signage, trade dress, design, menus, food offerings, displays and marketing and promotional programs for the corporation.  He also played a key role in strategic alliances with The Minute Maid Company, The Coca-Cola Company and Kraft Foods.   He participated in the assessment and integration of various strategic acquisitions by J&J. He reported to the President/CEO and managed a staff of 25 employees.

6.     In 2001, he led the development and marketplace introduction of a new added-value line of soft pretzel products, which was voted "Best New Product" in the snack category by Stagnito Publishing's New Products Magazine.  Subsequently, he delivered a presentation on

2

"New Product Innovation" at Stagnito Communications New Product Innovators Conference in Chicago.

7.      For ten years, he was a Guest Professor at Rutgers University School of Business in Camden, NJ, teaching classes on Marketing, International Marketing, Market Research, Consumer Behavior and Strategic Planning.  He was also a member of the Rutgers University School of Business Executive Advisory Council for over eight years and participated as a panelist numerous times at the Rutgers University Quarterly Business Outlook Conference.

8.      Prior to joining J&J Snack Foods Corp., he was employed by Kraft Foods from 1984 to 1990 as Marketing Manager and then Director of Marketing for Lender's Bagel Bakery, West Haven, CT, where he established the marketing department and was responsible for all marketing functions and an in-house advertising agency.  Business segments included retail, food service, supermarket in-store bakery/deli and private label.  He also acted as a marketing consultant at the two Lender's Bagel Bakery restaurants.

9.      Previously, he was a Group Product Manager with American Home Products Corp., New York, NY from 1982 to 1984, responsible for management and marketing for multiple food products, including CHEF BOY-AR-DEE products, GULDEN'S mustard, JIFFY POP popcorn, CRUNCH 'N MUNCH coated popcorn and DENNISON'S chili.  From 1978 to 1982, he was a Senior Product Manager at General Foods Corp., White Plains, NY managing several new products.

10.      From 1977 to 1978, he was a Product Manager at Sterling Drug Company, New York, N.Y.

11.      He was employed from 1971 to 1977 by the Topps Company, Brooklyn, NY as Product Manager, Assistant Product Manager and Assistant to the National Sales Manager.

12.    He holds a MBA '77 and BBA '71 from Bernard M. Baruch College, City University of New York.

**Assignment**

13.    He has been asked by Novak Druce + Quigg on behalf of Plaintiff Miller's Ale House Inc., to provide an expert opinion report regarding the potential of confusing similarity between Boynton Carolina Ale House (Defendant) and Plaintiff relating to their marketing, branding, advertising and operation of sports bar restaurants.  His expertise is in the area of marketing and branding and promotion and he was asked to address the aforementioned issue based on first hand observations of retail locations in Palm Beach county in Florida, and a review of documents described below.  He was not limited or restricted in any way as to what he could or should do, (or what he could not or should not do) or what he could or could not (or should or should not) consider or the weight to be afforded to any fact.  He was free to make any independent inquiry.

14.    He was not instructed as to the relevant law, but was instructed to make certain assumptions all of which are explained in this Declaration and Expert Report.

15.    After providing an oral report to counsel for Plaintiff, he was made aware of the content of the Declarations of Mark Peterson and Mitchell Koenig.

16.    He was made aware of the incorrect redemption of Defendant's coupons at Plaintiff's locations.  He was not instructed on the relevant law.

4

**Summary of Opinions**

17.     Based upon a reasonable degree of marketing certainty, there is a high degree of confusing similarity between the Plaintiff's and Defendant's Carolina restaurant concepts. As the result, the average consumer would likely be confused as to the source of goods and services between the two direct competitors for the reasons explained in detail below, namely, trademarks and trade dress.

18.     Based on a reasonable degree of marketing certainty, based on the trademarks, the average consumer is likely to believe that (or likely to be confused about whether) there is some sponsorship, affiliation and/or relationship between the Carolina Ale House restaurant in Boynton Beach and various restaurants of Plaintiff, especially those in Palm Beach County, Florida such as Boynton Ale House and Boca Ale House.

19.     Based on a reasonable degree of marketing certainty, based on the manner in which the names of the restaurants are marketed, the average consumer is likely to believe that (or likely to be confused about whether) there is some sponsorship, affiliation and/or relationship between the Defendants' restaurant in Boynton Beach and various restaurants of Plaintiff, especially those in Palm Beach County, Florida such as Boynton Ale House and Boca Ale House.

20.     Based on a reasonable degree of marketing certainty, based on various details of the appearance of the restaurants which he will describe later, the average consumer is likely to believe that (or likely to be confused about) whether there is some sponsorship, affiliation and/or relationship between the Defendant's restaurant in Boynton Beach and various restaurants of Plaintiff, especially those in Palm Beach County, Florida such as Boynton Ale House and Boca Ale House.

5

**Documents and Things Reviewed**

21.     He expressly considered the following documents prior to reaching a preliminary opinion:

      a.  Copy of advertisement for Carolina Ale House containing clip-out redeemable coupons;

      b.  Menus at Plaintiff's Boynton Ale House restaurant and Boca Ale House restaurant and Defendant's Carolina Ale House in Boynton Beach;

      c.  The exterior of Plaintiff's Boynton Ale House restaurant and Boca Ale House restaurant and Defendant's Carolina Ale House in Boynton Beach;

      d.  The interior of Plaintiff's Boynton Ale House restaurant and Boca Ale House restaurant and Defendant's Carolina Ale House in Boynton Beach.

22.     He considers the average reasonable consumer to be a person who would go into a "sports bar" for food and/or drink and to watch televised sporting events.  Based on his observation during visits to the three restaurants referred to in paragraph 21, the consumers were of various age groups, from college age up through "senior citizens".  At all three restaurants there are a typical extensive "sports bar" menu of food items with various appetizers, burgers, sandwiches, entrees, salads and desserts at comparable prices.

**Trade Mark**

23.     Each restaurant uses ALE HOUSE in large red letters on the outside of the building.  A geographic prefix (Carolina, Boynton, Boca) is included. When the geographic prefix is in substantially smaller type as is the case for Carolina, in his opinion, the average

6

reasonable consumer would not give any significance to the geographic prefix based at least in part on the relatively small size of the lettering but would be more likely to consider the restaurants to be related in that they belonged to the same chain or family of restaurants which use ALE HOUSE with a geographic prefix.

24.     Each restaurant uses ALE HOUSE in large letters on the menu.  In the case of Plaintiff, the lettering is red and yellow and in the case of Defendant the lettering is red.  Again, any prefix is in substantially smaller type.   In his opinion, the average reasonable consumer would not give any significance to the prefix based at least in part on the relatively small size of the lettering but would be more likely to consider the restaurants to be related in that they belonged to the same chain or family of restaurants.

25.     Each restaurant uses "ALE HOUSE" on its menu to denote specific food items. The menu for each restaurant lists items which would be expected in a sports bar.  From a branding standpoint, in the case of Plaintiff there are "Ale House Loaded Fries", "Ale House Combo" and "Ale House Mini Burgers".    Plaintiff's menu includes two "Miller's" items (Miller's Steak Sandwich and Miller's Cajun Mahi Pasta).  Significantly there are no individual menu items specifically designated as "Miller's Ale House …".  Thus, in his opinion, Plaintiff's menu sends a brand message to the average reasonable consumer of "ALE HOUSE".  In the case of Defendant, there are "Ale House Chili Nachos", "Ale House Onion Rings", "Ale House Reuben", "Ale House Fries", "Ale House Salad", "Ale House Chili", "Ale House Blackened Cheeseburger", "Ale House Chili Cheddar Cheeseburger", "Ale House Mud Pie" and "Ale House Mac & Cheese".  Defendant's menu includes only one "Carolina" menu item, "Carolina Hurricane", and no "Carolina Ale House" menu item.  Thus, in his opinion, Defendant's menu also sends a brand message to the average reasonable consumer of ALE HOUSE.

7

26.     The beer brand offerings at both Plaintiff's and Defendant's locations are extensive.  At Carolina, there are thirty-six varieties of draft on tap of which three are ales. There are thirty-seven varieties offered in bottles, with no ales. At Plaintiff's restaurant  there are twenty-nine varieties of draft on tap, with two ales.  There are twenty-eight varieties of bottles, with no ales.  However for both Plaintiff and Defendant, ales represent only a small fraction of the extensive beverage and food offerings product mix.  Thus, in his opinion, neither of the restaurants is using the name ALE HOUSE to suggest a location for purchasing and consuming ale.  In his opinion, the average reasonable consumer would not associate ALE HOUSE as identifying a location to purchase and consume ale.

27.     He has reviewed the portion of the Plaintiff's menu which lists the locations of over 45 of the Plaintiff's restaurants.  Each is preceded by a geographic prefix, thus for example in Palm Beach County, Florida, the restaurants are "Boca", "Boynton", East Boca", Gardens", "Jupiter".  Each of the 45+ locations follows this same format.  From a branding standpoint, this conveys a message to the average reasonable consumer about a chain or family of restaurants all using ALE HOUSE with a geographic prefix such that ALE HOUSE with a geographic prefix functions as a trademark or family of marks.  Furthermore, no restaurant or chain of restaurants could grow and expand over 20 years from one to 47 locations without high-quality food and service and the secondary meaning attributable to at least its name, if not its trade dress.  In his opinion, the average reasonable consumer would consider Carolina Ale House to be part of this chain or family of restaurants.  Thus, based on his experience, based on the number of locations, the consuming public has come to associate the term ALE HOUSE with a geographic prefix as a trademark or as an indicator of a family or chain of restaurants.  Additionally, the advertising and

8

publicity undertaken by Plaintiff has resulted in making Plaintiff's family of ALE HOUSE marks famous throughout at least Florida.

28.     When he refers to a family or chain of restaurants, this includes but it not limited to franchise situations.  Thus, in his opinion the average reasonable consumer would not necessarily know if an individual McDonald's was franchised or company owned, but would believe that there was a relationship among all the McDonald's fast food restaurants.

29.     In his opinion, the average reasonable consumer would believe that all restaurants using ALE HOUSE with a geographic prefix were either commonly owned (company) or franchised and therefore related, and the average reasonable consumer would thus believe that CAROLINA ALE HOUSE was somehow related to, or affiliated with, all the restaurants listed on Plaintiff's menu.

30.     By making the name "Carolina" small or subservient to the name Ale House on the signs, menus and menu items, based upon his marketing and branding expertise, there is nothing else which comes to mind which Carolina could have done to convey to the average reasonable consumer that ALE HOUSE with a geographic prefix was its trademark or brand name and that there was a relationship to the various restaurants in Plaintiff's restaurant chain. Thus Carolina does not distinguish or differentiate but rather conveys the appearance of the relationship.


**Trade Dress**

31.     Some features are expected in all restaurants, *e.g.*, a kitchen, tables and chairs, uniforms for the wait staff; some additional features are expected in a sports bar, *e.g.*, a bar, multiple television monitors, sports memorabilia.

32.     In his opinion and experience, branding and marketing involves the overall image and visual impression even though individual items, when considered alone, might be commonplace.

33.     Compared to the two Plaintiff's locations he observed, it is his opinion that the trade dress, namely the overall visual appearance, impression and image utilized at the Defendant's location, is confusingly similar and communicates the same overall net impression to an average reasonable consumer as the visual impression, image and appearance at Plaintiff's locations.  The specifics of this trade dress are the following.

   a.   The exterior appearance of the Defendant's location is a tan building with a predominant signage of "Ale House" in large red block letters that includes the extremely small geographic descriptor "Carolina."  It mimics the predominant "Ale House" red signage with geographic descriptors "Boca" and "Boynton" on the buildings where Plaintiff's restaurants are located.  Many other colors could have been chosen.  Many sports bars use other colors.  Many other restaurants use colors other than red.  It is not red *per se* but red in combination with the name and everything else in the "trade dress" which conveys the overall impression that the restaurants are somehow related.

   b.   Each uses the ALE HOUSE with geographic prefix trademark in red (or predominately red) on the menu with the prefix being in substantially smaller type.

   c.   Each uses the Ale House name on various menu items as described above.

   d.   The wait staff or servers wear a combination of dark top and khaki pants/shorts/skirt.  The top is "polo" type.

10

e. Each uses a floor plan including

    i. Centrally located rectangular peninsular bar with has seating on both sides.

    ii. An "open" kitchen such that consumers can see the workers in the kitchen.

    iii. The same soffit over the bar.

    iv. "High-top" tables (the type for which you sit on a bar-stool or bar-chair, and those high-top tables are arbitrarily on the right hand side of the restaurant as you enter the restaurant.

f. Each provides only a limited number of "ales" as explained above.

**Additional Explanation and Opinions**

34.    Marketing and brand positioning is a battle of perceptions. A brand positioning strategy attempts to create a unique selling proposition to differentiate the brand from its competitors. Plaintiff has utilized three distinctive communication elements to distinguish itself from other sports bar concepts.

a. First, the use of ALE HOUSE with a geographic prefix as an identifier or family of trademarks by Plaintiff is part of a brand building strategy. Although ale represents only a small fraction of its beverage offerings and thus sales, the ALE HOUSE with a geographic prefix trademark is associated with Plaintiff.   It is a deliberate way for Plaintiff to distinguish itself from other competitors through a unique brand architecture. Although it is an unusual marketing strategy, to emphasize something which constitutes a small percentage of sales, is it an effective way to differentiate its brand.  (He has presumed that sales of ale is a

11

small percentage of total sales, otherwise Plaintiff would have been expected to expand its offering of ales.)  Defendant has copied the use of Ale House with subservient use of Carolina.

b.  Second, the use of geographic prefix such as Boca and Boynton by Plaintiff to precede "Ale House" provides a further distinguishing characteristic to help consumers distinguish its brand from competitors by the use of a family of trademarks.  If Plaintiff was first in the market, then this has been copied by Defendant since "Carolina" has no relationship to Defendant's location (it is not on a street named Carolina, nor in a city named Carolina, etc).

c.  The use of a large red block letters to identify "Ale House" with a geographic prefix on the restaurant façade by Plaintiff has also been utilized by Defendant. This is the first thing which the consumer will see when looking for a restaurant.

35.    The similar marketing positioning and trade dress that is utilized by Plaintiff is being used by Defendant for the same goods and services.  This in itself creates confusing similar branding that will likely create potential confusion among customers.


**Terms of Service as an Expert**

36.    He charges $350/hour for expert witness or related consulting.  He has not previously served as an expert witness.


**Additional Question Presented By Plaintiff's Counsel**

37.    After completing his report, he was asked by counsel for Plaintiff that if he had hypothetically been hired by Carolina, to assist with their marketing and branding, what else

12

could have been done to deliberately make it appear that Carolina had some affiliation or relationship with Plaintiff, other than what was already done by Defendant.  He responded that he could not think of anything else Defendant could have done beyond that which it already had done.

**Observations on Statements in Other Declarations**

38.     After completing his report, he was shown the Declaration of Mark Peterson and the Declaration of Mitchell Koenig.  He has the following observations.

      a.  First, the methodology used to determine the impact of Defendant on the sales of Plaintiff's Boynton Beach location, including taking into account the effect of the economy in the manner proposed by Mr. Peterson, based on his experience, is a proper methodology and the conclusion of an adverse impact is supported by the numbers presented.  He is not aware of any other restaurant in the Boynton Beach area of Plaintiff and Defendant which uses the name ALE HOUSE which has opened in the last two years, and he is not aware of any other sports bar in which has opened in that same area in the past two years.  Thus, in his opinion, the adverse impact on sales is attributable to consumer confusion and not merely another restaurant opening in the area.

      b.  Second, the information provided in those Declarations regarding vendors and potential employees makes it clear that even persons who would be expected to be able to differentiate between Defendant on the one hand and Plaintiff on the other hand, and who would want to make the distinction between the two, have been mistaken or confused.

13

c.   Third, the quantity of consumer confusion in patrons calling or entering the wrong restaurant not only supports his conclusions set forth above, but the timing (more than six months after Defendant has opened) makes it inevitable that substantial consumer confusion will continue.

Executed in Miami Beach, Florida on this
$\underline{18}^{TH}$ day of June, 2009, under penalty
of perjury.

_Michael Karaban_
_____
Michael Karaban

14



# EXHIBIT 16

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

VA      VAU

EFFECTIVE DATE OF REGISTRATION

Month    Day    Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**TITLE OF THIS WORK ▼**

Ale House Floor Plan Five

**NATURE OF THIS WORK ▼** See instructions

technical/architectural drawing

**PREVIOUS OR ALTERNATIVE TITLES ▼**

Brandon Ale House

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   Title of Collective Work ▼

If published in a periodical or serial give:   Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

**NAME OF AUTHOR ▼**

John W. Miller

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

1941   still alive

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ☐ Citizen of ▶ U S A
☐ Domiciled in ▶ Florida

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was made for hire check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**NATURE OF AUTHORSHIP** Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture
☐ 2-Dimensional artwork
☐ Reproduction of work of art
☐ Design on sheetlike material
☐ Map
☐ Photograph
☐ Jewelry design
☒ Technical drawing
☐ Text
☒ Architectural work

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ☐ Citizen of ▶
☐ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). See instructions
☐ 3-Dimensional sculpture
☐ 2-Dimensional artwork
☐ Reproduction of work of art
☐ Design on sheetlike material
☐ Map
☐ Photograph
☐ Jewelry design
☐ Technical drawing
☐ Text
☐ Architectural work

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given

1996 ◀ Year in all cases.

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ▶   Day ▶   Year ▶
Nation

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Ale House Management, Inc.
612 N. Orange Avenue, Suite C-6
Jupiter, Florida 33458

**APPLICATION RECEIVED**

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

By assignment from John W. Miller and
Florida Design Professionals to Ale House
Management, Inc.

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.   • See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE

EXAMINED BY

CHECKED BY

☐ CORRESPONDENCE
Yes

FORM VA

FOR
COPYRIGHT
OFFICE
USE
ONLY

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☒ Yes  ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☒ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give Previous Registration Number ▼    pending    Year of Registration ▼

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

Ale House Floor Plan One

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

This is a floor plan used by several restaurants in a restaurant chain. This particular plan varies slightly in size (sq.ft.) from the original earlier version in size because this was a conversion of another restaurant

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼    Account Number ▼

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼

Michael J. Burley, Esquire
250 Tequesta Drive
Suite 202
Tequesta, Florida 33469

Area Code and Telephone Number ►  (561)744-3100

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▼

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of  Ale House Management, Inc.
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Michael J. Burley, Esquire    Date ► 3-10-98

Handwritten signature (X) ▼

_[signature]_

**Mail certificate to:**

Name ▼
Ale House Management, Inc.
c/o Michael J. Burley, Esquire

Number/Street/Apt ▼
250 Tequesta Drive, SUite 202

City/State/ZIP ▼
Tequesta, Florida 33469

**YOU MUST:**
• Complete all necessary spaces
• Sign your application in space 8

**SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:**
1. Application form
2. Nonrefundable $20 filing fee in check or money order payable to Register of Copyrights
3. Deposit material

**MAIL TO:**
Register of Copyrights
Library of Congress
Washington, D.C. 20559-6000



Type of Work:        Visual Material

Registration Number / Date:
                     VAu000434206 / 1998-03-23

Application Title: Brandon Ale House.

Title:               Al House floor plan five.

Description:         Technical drawing.

Copyright Claimant:
                     Ale House Management, Inc.

Date of Creation: 1996

Authorship on Application:
                     Florida Design Professionals, Inc., employer for hire.

Previous Registration:
                     Preexisting material: Ale House floor plan one.

Basis of Claim:      New Matter: revision to drawings.

Copyright Note:      C.O. correspondence.

Names:               Ale House Management, Inc.
                     Florida Design Professionals, Inc.

================================================================================