UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-80918-CIV-MARRA/JOHNSON

MILLER'S ALE HOUSE, INC.,

        Plaintiff,

vs.

BOYNTON CAROLINA ALE HOUSE, LLC,

        Defendant.

_____/

### OPINION AND ORDER

This cause is before the Court on Defendant Boynton Carolina Ale House, LLC's Motion for Summary Judgment [DE 70]. The motion is fully briefed and ripe for review. The Court has carefully considered the filings of the parties and is otherwise fully advised in the premises.

## I. BACKGROUND

The facts, as collected from the affidavits, exhibits, depositions, and answers to interrogatories, are taken in a light most favorable to the non-moving party for the purposes of this motion and are as follows:

Plaintiff Miller's Ale House, Inc. ("Miller's") has continuously operated a chain of restaurants in Florida for over 20 years. (Mark Peterson Declaration, June 21, 2010, ¶ 5, DE 90-1). Miller's restaurants are neighborhood sports bars that serve food and alcohol in a family-friendly environment. (See

1

Miller's Website, DE 90-3). In total, Miller's operates over 40 restaurants in Florida. (Peterson Dec. ¶ 3, DE 90-1).

Each Miller's restaurant is branded with a geographic prefix followed by the term "ALE HOUSE." (Peterson Dec. ¶ 9, DE 90-1). This geographic prefix typically refers to the city, street, or neighborhood where each Miller's restaurant is located; for instance, the "JUPITER ALE HOUSE" is in Jupiter, Florida and the "KIRKMAN ALE HOUSE" is located on Kirkman Road in Orlando, Florida. (Peterson Dec. ¶ 10, DE 90-1). At least one Miller's location is named after a prominent local landmark: the Miller's restaurant near the Orlando International Airport is called the "AIRPORT ALE HOUSE." Id. Miller's also operates several locations outside Florida that use the same naming system; the "PHILADEPHIA ALE HOUSE," for example, is located in Philadelphia, Pennsylvania. (See Miller's Website, DE 90-4).

Each Miller's location displays its name (the geographic prefix plus the term "ALE HOUSE") in red letters on the outside of its building. (Mitchell Koenig Declaration, June 21, 2010, ¶ 3, DE 90-2). The term "ALE HOUSE" also appears regularly inside the restaurant, to the point where it is used to brand specific menu items, like "Ale House Loaded Fries." (See Miller's Menu, DE 90-11). In addition to the repeated use of "ALE HOUSE," there are numerous features common to every Miller's location that contribute to the overall image of the brand: server uniforms consisting of a dark polo shirt

2

and khaki pants, two persons present at the host station, dock wood on the walls, a centrally located rectangular peninsular bar with seating on both sides, a soffit over the bar, an "open" kitchen that allows customers to see food preparation, and "high-top" tables on the right hand side of the restaurant. (Koenig Dec. ¶ 3, DE 90-2). Miller's has copyrighted a number of the common floor plans that it uses in its restaurants. Ale House Floor Plans, Ex. 1-a, DE 31-2.

Miller's promotes the "ALE HOUSE" family of restaurants through a shared website, as well as through its Facebook and Twitter profiles. (Peterson Dec. ¶ 23, DE 90-1). Miller's markets the "ALE HOUSE" brand on intra-restaurant materials, such as flyers, posters, and banners. (Peterson Dec. ¶ 25, DE 90-1). Miller's "ALE HOUSE" restaurants also sponsor local sports teams, high school bands, and charity events. (Mark Peterson Declaration, June 19, 2009, ¶ 15, DE 90-13). In the past, Miller's has sponsored professional teams like the Florida Marlins and the Miami Dolphins. (Peterson Dec. ¶ 16, DE 90-13). Finally, Miller's engages in co-branding efforts with beer companies such as Miller's Brewing and Budweiser, using radio commercials to notify customers of beer-related special events and promotions taking place at each Miller's location. (Peterson Dec. ¶ 25, DE 90-1). As a result of these promotional efforts, many Florida residents associate the words "Ale House" exclusively with

Miller's restaurants. (Danielle Caban Declaration, June 20, 2010, ¶ 8, DE 90-37; Dan Quong Declaration, June 20, 2010, ¶ 5, DE 90-38).

In April 2008, Defendant Boynton Carolina Ale House, LLC ("BCAH") opened a restaurant named "Carolina Ale House" in Boynton Beach, Florida. (Peterson Dec. ¶ 4, DE 90-13). BCAH's restaurant is located about one mile away from Miller's "BOYNTON BEACH ALE HOUSE" location. Id. BCAH operates "Carolina Ale House" under a license from LM Restaurants, Inc. ("LMR"), which licenses the "Carolina Ale House" brand to 13 restaurants across North Carolina, South Carolina, and Florida. (Lou Moshakos Affidavit, April 7, 2010, Ex. B, ¶ 11, DE 72-2).

Like Miller's, BCAH uses a red logo that prominently features the words "Ale House;" this logo is displayed on both the outside of the building and on the uniforms of BCAH employees. Picture of BCAH exterior, DE 90-26; Picture of BCAH uniform, DE 90-31. BCAH also sells menu items with the prefix "Ale House," such as "Ale House Chili" and "Ale House Mud Pie." (Mitchell Koenig Declaration, June 19, 2009, ¶ 10c, DE 90-32). BCAH servers wear dark Polo shirts with khaki shorts or slacks. (Koenig Dec., ¶ 10f, DE 90-32). BCAH's floor plan is similar to Miller's in that it features a centrally located bar area, an open kitchen, dock wood on the interior walls, and high-top seating on the right side. (Koenig Dec., ¶ 10g, DE 90-32); Ale House Floor Plan, DE 90-59; BCAH Floor Plan, DE 90-60.

4

There are also similarities between the two establishments in terms of the services and promotions that they offer. For instance, Miller's offers $5 off $25 coupons in the "Clipper" Magazine. (Peterson Dec. ¶ 15, DE 90-13). BCAH has offered $5 off $25 coupons. BCAH Coupons, DE 90-36. It is claimed on BCAH's coupons that they are valid at "participating Palm Beach area locations," even though there is only one Carolina Ale House location in Palm Beach County. Id. Like Miller's, BCAH advertises pay-per-view mixed martial arts "fight nights."  Other "Carolina Ale House" locations outside of Florida do not appear to advertise these events. "Carolina Ale House" Websites, DE 90-79; BCAH and Weston Websites, DE 90-80. Both BCAH and Miller's advertise day-specific dining discounts such as lunch specials, "Kids Eat Free Nights" and "Ladies Night." Miller's Specials Flyer, DE 90-8; BCAH Specials Flyer, DE 90-28.

Since BCAH opened the "Carolina Ale House" down the road from Miller's Boynton location, there have been a number of instances where customers have confused the two restaurants. (Koenig Dec. ¶ 12, DE 90-32). Diners at Miller's Boynton location have asked whether BCAH's establishment is related to Miller's. (Robert Skinner Declaration, June 11, 2010, ¶ 7, DE 90-42). Customers with take-out orders have mistakenly come to BCAH's "Carolina Ale House" instead of Miller's Boynton location. (Michael Therien Declaration, June 11, 2010, ¶ 5, DE 90-40). "Carolina Ale

House" patrons have asked for menu items that are only available at Miller's locations. (Amanda Pacinelli Declaration, June 4, 2010, ¶ 7, DE 90-43). Customers have arrived at Miller's Boynton location expecting to meet their friends or family, who are actually waiting for them at the "Carolina Ale House," and vice versa. (Carrie Lingafelter Declaration, June 4, 2010, ¶ 6, DE 90-44). People have attempted to redeem "Carolina Ale House" coupons at Miller's Boynton location. (Shannon Tedesco Declaration, June 4, 2010, ¶ 7, DE 90-45).

On June 16, 2009, Miller's filed the instant suit, alleging trademark infringement and trade dress infringement under both Florida law and Section 43 of the Lanham Act. Complaint, ¶ 1, DE 1. Miller's also sues for copyright infringement under the Copyright Act of 1976, for unfair competition under the Lanham Act, and for Florida trademark dilution. Id.

The instant case is not the first time Miller's "ALE HOUSE" branding has been examined in federal court. On March 26, 1998, Ale House Management, Inc. (AHM), Miller's predecessor in interest,[1]  sued another LMR licensee, Raleigh Ale House, Inc. (RAHI), alleging trademark and trade dress infringement, copyright infringement, and unfair trade practices. See Ale House Management Inc. v. Raleigh Ale House, Inc., et al, 5:98-cv-247-F(2)

---

[1]  See Defendant's Amended Statement of Facts in Support of Motion for Summary Judgment, ¶ 2, n.2 DE 73.  In the Statement of Disputed Material Facts in Opposition to Defendant's Motion for Summary Judgment filed  by Plaintiff, DE 90, it did not refute this fact.

6

(E.D.N.C.), Ex. 1, DE 31-1. In that case, AHM claimed that RAHI's use of the term "ale house" in its restaurant name, "Carolina Ale House," infringed AHM's trademark rights. Id. The U.S. District Court for the Eastern District of North Carolina granted summary judgment for RAHI. Ex. 10, DE 31-11. In affirming the judgment of the District Court, the Fourth Circuit Court of Appeals held, *inter alia*, that "ale house" was a generic term that could not be protected under federal trademark law. Ale House Management, Inc. v. Raleigh Ale House, Inc., 205 F.3d 137, 140-42 (4th Cir. 2000).

Since the previous lawsuit, more than 20 new Miller's locations have opened; Miller's restaurants now appear to be the predominant users of the term "Ale House" in Florida. For example, a local newspaper, the Sun-Sentinel, hosts a web-based dining guide that separates restaurants and bars into various categories. Sun-Sentinel Webpage, DE 90-62. These categories include "Sports," "Beer Garden," "Brewery," "Beerpub," and "Pub," but not "Ale House." Sun-Sentinel Webpage, Bars & Clubs Section, DE 90-64. When typing "ale house" in the search field of the webpage, nearly all of the entries are Miller's restaurants. Sun-Sentinel Webpage, Find Local Search Tool, DE 90-64. In the same vein, local yellow page phone directories throughout the Palm Beach County area separate dining establishments into subcategories, such as "Bars & Taverns," "Restaurants," and "Sports Bars;" there is no separate category for "Ale Houses." Phone Books, Exs. 69-74, DE

90-69 to DE 90-74. Finally, another website entitled "SportsTavern.com"
provides a directory of sports bars throughout the U.S.; under the listings for
several cities in South Florida, several Miller's "ALE HOUSE" restaurants are
listed. SportsTavern.com Directory, DE 90-75.

Despite the ubiquitousness of Miller's locations in Florida, the "Ale
House" moniker is also used by other parties in South Florida besides Miller's
and BCAH. Another LMR licensee has operated a Carolina Ale House location
in Weston, Florida since 2005. (Moshakos Aff. ¶ 10, DE 72-2). Additionally,
the "Palm Beach Ale House & Raw Bar," an independent restaurant unrelated
to either of the parties in this case, currently operates in Palm Beach County.
See Miller v. Preefer, 1 So. 3d 1278 (Fla. Dist. Ct. App. 4th Dist. 2009)
(Miller's suit against Jay Preefer, the proprietor of "Palm Beach Ale House &
Raw Bar"). BCAH has also presented the testimony of Dr. Ronald Butters, a
professor of English at Duke University. (Ronald Butters Report, March 3,
2010, Ex. A, ¶ 4, DE 72-1). Dr. Butters examined several popular
dictionaries and found that they defined the word "alehouse" as an
"establishment that serves ale." (Butters Rep. ¶ 13, DE 72-1). Dr. Butters
also identified numerous restaurants outside of Florida that use the term "ale
house" or "alehouse" in their names. (Butters Rep. ¶¶ 20-21, DE 72-1)

BCAH moves for summary judgment, arguing that: (1) "ale house" is a
generic term not protectable under trademark law; (2) Miller's trade dress is

unprotectable; (3) there is no evidence that BCAH had access to Miller's floor plans; (4) BCAH's floor plan and Miller's copyrighted floor plan are not substantially similar; (5) there is no evidence of unfair trade practices; and finally, (6) collateral estoppel bars Miller's trademark, trade dress, and copyright claims. DE 71.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment may be rendered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289 (1968)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar

materials negating the opponent's claim." Id. at 323. "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

After the movant has met this burden, the non-moving party must produce evidence that shows that a material fact is in genuine dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." Id. at 252. The nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

In deciding a motion for summary judgment, the Court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1369 (11th Cir. 1998) (citations and quotations omitted). The Court must avoid weighing conflicting evidence or making credibility determinations." Hilburn v. Murata Elecs. N. Am. Inc., 181 F.3d 1220, 1225 (11th Cir. 1999). Notwithstanding that limitation, if the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. at 249-50.

10

## III. LEGAL DISCUSSION

### A. Miller's Trademark Infringement Claim

Miller's claims that BCAH has infringed its trademark in the term "ale house" and violated its rights under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. The relevant portions of the statute provide as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

"In order to prevail on a claim of trademark infringement, a plaintiff has the burden of showing (1) that he had a valid trademark and (2) that the defendant had adopted an identical or similar mark such that consumers were likely to confuse the two." Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). A trademark's validity depends on its distinctiveness;

in order to be registered, a trademark "must be capable of distinguishing the applicant's goods from those of others." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992).

The Supreme Court has divided marks into five categories of distinctiveness, in increasing order of strength: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. See id. The strongest marks are "fanciful," consisting of words or symbols that were invented solely for their use as trademarks. See Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 n.12 (2d Cir. 1976). The weakest marks are generic, referring only "to a class of which an individual service is a member (e.g., 'liquor store' used in connection with the sale of liquor)." Frehling Enterprises, Inc. v. International Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999). "[T]he test for genericness is whether the public perceives the term primarily as the designation of the article" itself. Blinded Veterans Ass'n v. Blinded American Veterans Foundation, 872 F.2d 1035, 1041 (D.C. Cir. 1989) ("'blinded veterans' is generic when used to refer to once-sighted persons who served in the armed forces"). See also Burger King Corp. v. Pilgrim's Pride Corp., 705 F. Supp. 1522, 1525 (S.D. Fla. 1988) (when analyzing genericness of fast food franchise's "chicken tenders," relevant public was retail consumers). Genericness lies not in the term, but in the *use* of the term; "[a] word may be generic of some things and not of others: 'ivory' is

12

generic of elephant tusks but arbitrary as applied to soap." <u>Soweco, Inc. v.</u>
<u>Shell Oil, Co.</u>, 617 F.2d 1178, 1183 (5th Cir. 1980).

Here, BCAH argues that the Fourth Circuit ruling in <u>Ale House</u>
<u>Management, Inc. v. Raleigh Ale House, Inc.</u>, 205 F.3d 137 (2000) precludes
Miller's from asserting that the term "ale house" is not a generic phrase
denoting an establishment that serves ale or beer. Miller's argues that issue
preclusion does not apply because the Fourth Circuit case assessed the
validity of the "Ale House" mark as it applied to North Carolina, not as it
applied to Florida. Miller's also claims that the present action involves a
different time and different consumers, and thus it cannot be estopped from
arguing that its "ALE HOUSE" mark has become protectable.[2]

## 1. Recapturing Generic Terms

A generic use of a word may not be registered as a trademark. <u>Park 'N</u>
<u>Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 194 (1985). This is true
even if a generic term becomes in some degree associated with a particular
brand by consumers, as "[t]he public has no more right than a manufacturer
to withdraw from the language a generic term, already applicable to the
relevant category of products, and accord it trademark significance, at least
as long as the term retains some generic meaning." <u>Harley Davidson, Inc. v.</u>

---

[2] To the extent Miller's is claiming trademark rights in a family of
marks with "ALE HOUSE" as a common surname, a determination that the
"ALE HOUSE" surname is generic would be fatal to the entire mark. <u>See</u>
<u>Spraying System Co. v. Delavan, Inc.</u>, 975 F.2d 387, 395 (7th Cir. 1992).

Grottanelli, 164 F.3d 806, 812 (2d Cir. 1999). See also Welding Services,
Inc. v. Forman, 509 F.3d 1351, 1358 (11th Cir. 2007) ("term used
generically cannot be appropriated from the public domain"); Soweco, 617
F.2d at 1185 n.20 (generic terms subject to cancellation); Miller Brewing Co.
v. Falstaff Brewing Corp., 655 F.2d 5, 7-8 (1st Cir. 1981) (no circumstances
where generic term is susceptible of de jure protection).

   In rare instances, courts have held that a term previously categorized
as generic could be recaptured as a trademark. In Singer Mfg. Co. v. Briley,
207 F.2d 519 (5th Cir. 1953), for example, the Court of Appeals for the Fifth
Circuit approved injunctive relief to protect "Singer"-brand sewing machines
despite a prior Supreme Court opinion, Singer Mfg. Co. v. June Mfg. Co., 163
U.S. 169 (1896), holding that the term "Singer" was generic. The court of
appeals approved the district court's conclusion that "constant and exclusive
use of the name 'Singer' in designating sewing machines" had changed
consumer perception. 207 F.2d at 522. In the half-century after the
Supreme Court's opinion, the "Singer" mark had become a distinctive
"guarantee of quality" rather than merely indicating "the class and type of
machines made by [the Singer] company." Id. at 520 n.3. As such, "Singer"
was recaptured as a trademark and entitled to exclusively denote the
"genuine product of the Singer Manufacturing Company." Id. at 520 n.2.

## 2. Application of Issue Preclusion in Trademark Law

Replacing a "confusing lexicon," the term "issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'" Taylor v. Sturgell, 553 U.S. 880, 892 n.5 (2008). "Issue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." Id. at 2171 (quoting New Hampshire v. Maine, 532 U.S. 742, 748 (2001)). Issue preclusion "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979)(emphasis added). In the Eleventh Circuit, issue preclusion operates when

> (1) the issue at stake is identical to the one involved in the prior litigation;
> (2) the issue must have been actually litigated in the prior suit;
> (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and
> (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.

CSX Transportation, Inc. v. Brotherhood of Maintenance of Way Employees, 327 F.3d 1309, 1317 (11th Cir. 2003).[3]

_____

[3] Miller's is the direct successor in interest of AHM, the plaintiff in the Fourth Circuit case. See n.1 at p.6, supra.  An assignee of a trademark

In support of its argument that issue preclusion does not apply, Miller's points to Opryland USA Inc. v. Great American Music Show, Inc., 970 F.2d 847 (Fed. Cir. 1992), where the Court of Appeals for the Federal Circuit held that a prior finding of genericness did not bar a party from presenting evidence of public perception in proceedings before the Trademark Trial and Appeal Board. In Opryland, Opryland USA opposed the registration of "THE CAROLINA OPRY," arguing that the term was confusingly similar to Opryland's own marks. On summary judgment, the Board dismissed Opryland's opposition; the Board found that the Eighth Circuit's decision in WSM, Inc. v. Hilton, 724 F.2d 1320 (8th Cir. 1984)[4] estopped Opryland from disputing the genericness of the term "opry." The Court of Appeals for the Federal Circuit reversed:

> Whether "opry" has been recaptured as a trademark is not the subject of these opposition and cancellation proceedings, which deal with the registrability of the CAROLINA OPRY marks. However, Opryland is not estopped from showing the public perception of "opry", as a significant component of the marks at issue. The Board erred in holding that Opryland could not present evidence of the present public perception of the term "opry", for such evidence is of probative value in connection with the section 2 issues requiring adjudication.

---

"steps into the shoes" of the assignor. Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307, 1310 (11th Cir. 1999). The Court therefore holds that AHM and Miller's are either in privity with each other or have "substantive legal relationships" with each other that permits issue preclusion to be applied in this case.  Taylor, 553 U.S. at 893-4; Parklane Hosiery Co., 439 U.S. at 326.

[4] WSM was Opryland's corporate predecessor. 970 F.2d at 853.

16

970 F.2d at 853. The Court finds <u>Opryland USA</u> to be of limited value in the instant case. The Federal Circuit stopped well short of holding that Opryland had recaptured the generic term "opry," instead only concluding that Opryland was entitled to oppose a trademark registration with evidence of public perception.

Miller's is correct that changed circumstances can thwart the operation of issue preclusion. If "there are material changed circumstances since the date of the initial court determination," issue preclusion is inapplicable. <u>Gaylord Entertainment Co. v. Gilmore Entertainment Group</u>, 187 F. Supp. 2d 926, 942 (M.D. Tenn. 2001). In the trademark context, consumer perception of words and symbols can change over time. <u>See</u> <u>American Heritage Life Ins. Co. v. Heritage Life Ins. Co.</u>, 494 F.2d 3, 15-16 (5th Cir. 1974) (words may "grow in individuality"). However, an "onerous burden [is] placed on the court and the parties in constantly re-litigating [trademark validity]." <u>Test Masters Educational Services, Inc. v. Singh</u>, 428 F.3d 559, 574 (5th Cir. 2005). While there are no "precise time contours" that govern when a mark can be reconsidered, courts generally require that claimants show a "significant intervening factual change" before allowing the validity of a mark to be relitigated. <u>Id</u>. at 575. When challenging a prior determination of genericness, a plaintiff must present evidence that the term has ceased to have a generic meaning. <u>Harley Davidson</u>, 164 F.3d at 811; <u>Miller Brewing</u>

17

Co., 655 F.2d at 9. Miller's has not presented sufficient evidence to raise a genuine issue of material fact regarding changed circumstances.

### 3. Miller's Evidence of Nongenericness is Insufficient

The Court first notes that BCAH has met its initial burden on summary judgment by presenting substantial evidence that "ale house" continues to be a generic term. BCAH has shown that there are multiple dining establishments that use the term "ale house" in their names; one of these establishments, "The Palm Beach Ale House & Raw Bar," even operates in Palm Beach County. See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 1523 (11th Cir. 1991) (third party usage by competitors is relevant to the distinctiveness inquiry). BCAH's expert witness, Dr. Ronald Butters, identified numerous other restaurants and bars around the country that employ the phrase "ale house" in their names. Dr. Butters also presented several current dictionaries that define "alehouse" as a generic term for a place that serves ale. See Vision Center v. Opticks, Inc., 596 F.2d 111, 116 n.13 (5th Cir. 1979) (dictionary evidence is probative of the ordinary significance and meaning of words to the public).

In response, Miller's argues that this case involves different issues than the prior Fourth Circuit determination.  Miller's contends that because this litigation involves a different region, a different time, and different consumers, the legal issue being determined is not identical to the prior

case. Thus, Miller's asserts issue preclusion should not apply. Miller's also argues that "ale house" has ceased to be a generic term in the time between the Fourth Circuit decision and the present. In light of the evidence Miller has produced, the Court does not agree with either of these arguments.

There are two critical deficiencies with the evidence Miller's has presented to avoid the operation of issue preclusion. First, virtually all of Miller's material on consumers' perception of "ale house" is confined to Florida. This is problematic because "[t]he owner of a registered mark . . . enjoys the unlimited right to use the mark nationwide," Tana v. Dantanna's, 611 F.3d 767, 780 (11th Cir. 2010), and therefore "[a]pplicants seeking the benefits of federal registration for their alleged trademark cannot divide up the country piecemeal into those regions where the mark is generic and those regions where it is not." BellSouth Corp. v. DataNational Corp., 60 F.3d 1565, 1571 (Fed. Cir. 1995) ("walking fingers" logo could not be registered as a trademark).

In this case, in order for Miller's to avoid the bar of issue preclusion, it must show that consumer perception has changed nationwide, not only in a particular state. To this end, Miller's has proffered testimony from Florida customers stating that they use the term "ale house" to refer to Miller's chain of restaurants, and it has also shown that it has advertised and expanded its "ALE HOUSE" chain of restaurants extensively in Florida. Yet

19

despite the fact that Miller's operates several locations *outside* of Florida, Miller's presents no evidence showing how the public views the term "ale house" in other parts of the country. Thus, even inferring from Miller's evidence that a Florida consumer now associates the phrase "ale house" exclusively with Miller's restaurants, such evidence does nothing to indicate how a Georgia or Pennsylvania consumer would view the term.

On a national level, the Court finds that Miller's position in the marketplace is unchanged from where it was in the prior case. The Fourth Circuit Court of Appeals noted that Miller's was a Florida-based chain that "had opened 21 facilities throughout Florida." Ale House Management, 205 F.3d at 139. In the ten years since then, Miller's has more than doubled the number of locations it operates in Florida, but has not significantly expanded into other markets or engaged in national advertising campaigns. Miller's expansion is thus markedly different from the situation examined in Singer Mfg. Co. v. Briley, where the Singer Manufacturing Company spent a half-century selling its brand of sewing machines nationwide before the Court of Appeals for the Fifth Circuit held that Singer had recaptured its mark. Miller's has not presented sufficient evidence of this kind of pervasive, prolonged presence in the national restaurant market, and therefore it has not raised a genuine issue of material fact relative to the question of whether consumer perception of the word "ale house" has changed nationwide.

20

The second deficiency with Miller's evidence is that it is insufficient to raise a genuine issue of material fact as to whether a significant intervening factual change has occurred. For instance, Miller's has submitted South Florida phone books and webpage restaurant directories that do not use the term "ale house" as a category heading.[5]  The absence of "ale house" from such headings does nothing to raise a question of fact as to whether "ale house" no longer carries any generic meaning for the relevant dining public. See Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 938-39 (7th Cir. 1986) (evidence showing that few companies used the term "liquid controls" in trade directories and publications did not raise genuine issue of material fact).

Miller's also proffers anecdotal testimony from former employees and customers of Miller's Boynton location and BCAH's restaurant, as well as a confusion calendar and logbook kept by the employees of Miller's Boynton location to record instances of actual confusion. Taken in a light most favorable to Miller's, the evidence shows that some diners have mistaken Miller's Boyton location for BCAH's restaurant (and vice versa). It also shows that customers have been confused as to whether the two establishments are related. This sort of actual confusion evidence is irrelevant, however,

---

[5] The Court notes that there are a number of common restaurant appellations, such as "café" or "bistro," that may be absent from the category headings of local phone books or web directories, but that are nonetheless generic terms.

"unless the mark is protectible in the first instance." <u>Gift of Learning Foundation, Inc. v. TGC, Inc.</u>, 329 F.3d 792, 801 (11th Cir. 2003). Additionally, Miller's anecdotal confusion evidence is much less comprehensive and much less reliable than a traditional, systematically conducted consumer survey. Miller's calendar and logbook evidence, for instance, is limited to patrons of the Boynton Miller's location. This is a narrow sampling that sheds little light on the genericness of "ale house" to the general public, since the people being surveyed are already dining at Miller's "ALE HOUSE" and may not have the same perception of the term as the general dining public.[6] Even when taken in the aggregate, the Court holds that any instances where "ale house" has lost its generic meaning to particular Florida customers are *de minimis*, and that no jury could reasonably find that these anecdotes indicate the term "ale house" has lost all generic meaning in the mind of the public.

### 4. Conclusion

Viewing the reasonable inferences from the evidence in Miller's favor, Miller's evidence is insufficient as a matter of law to bring before a jury. <u>See</u> <u>Bellsouth</u>, 60 F.3d at 1571 ("against the uncontested evidence of

---

[6] Some circuits disapprove of consumer survey evidence entirely in the genericness inquiry when the term in question is not a coined name, on the basis that secondary meaning can never take a term out of the public domain. <u>See</u> <u>generally</u> <u>Schwan's IP, LLC v. Kraft Pizza Co.</u>, 460 F.3d 971 (8th Cir. 2006) (restricting survey evidence to instances where a coined word has been allegedly genericized).

genericness" in other areas, indirect evidence that mark is not generic in a particular area "cannot raise a genuine issue of material fact"). The Court therefore holds that Miller's trademark infringement claim is barred by the doctrine of issue preclusion.

### B. Miller's Trade Dress Infringement Claim

"It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source." <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 28 (2001). "'Trade Dress' involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." <u>John Harland Co. v. Clarke Checks, Inc.</u>, 711 F.2d 966, 980 (11th Cir. 1983). Like trademarks, trade dress is protected under Section 43(a) of the Lanham Act. <u>AmBrit, Inc. v. Kraft, Inc.</u>, 812 F.2d 1531, 1535 (11th Cir. 1986).

Miller's contends that BCAH has infringed Miller's trade dress by appropriating Miller's interior decor, layout, and red-colored logos. As an initial matter, BCAH argues that issue preclusion bars Miller's from relitigating its trade dress claim. <u>See</u> *supra* Part III.A.2. In <u>Ale House Management, Inc. v. Raleigh Ale House, Inc.</u>, 205 F.3d 137 (4th Cir. 2000), the Court of Appeals held that Miller's interior floorplan was neither "unique"

23

nor "unusual," and that Miller's had "not advanced sufficient evidence to support its claim to a proprietary interest in the appearance and service it employs in the interior of its facilities."[7] 205 F.3d at 142. In this case, Miller's now claims that, in addition to its interior floorplan, its restaurants' menu design, interior decor, and service staff appearance constitute a distinctive trade dress. Because the Fourth Circuit ruling on Miller's trade dress was apparently limited to the interior floor layout of Miller's restaurants, and the claimed trade dress in this case is new and distinct from the interior elements claimed in the prior case, the Court finds that Miller's current claim is not barred by issue preclusion.

To prove trade dress infringement with respect to a particular product design, a plaintiff must prove "(1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning." Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1202 (11th Cir. 2004). The trade dress analysis uses the same spectrum of distinctiveness found in trademark law: trade dress can be generic, descriptive, suggestive, arbitrary, or fanciful. See Two Pesos,

_____

[7] In granting summary judgment, the District Court adopted RAHI's memorandum of law in its entirety. Order of Eastern District of North Carolina, Ex. 10, DE 31-11. The Court notes that RAHI's memorandum did not directly argue that Miller's trade *dress* is generic and unprotectable. See Memorandum in Support of Defendants' Motion to Dismiss, Ex. 3, DE 31-4.

24

Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767 (1992).

## 1. Miller's Trade Dress Lacks Inherent Distinctiveness

BCAH claims that Miller's trade dress is generic and unprotectable.

Miller's argues in response that its trade dress is distinct, especially when

considering the overall impression conveyed by Miller's restaurant interior,

its red logo signage, and the use of "ale house" in various menu items.

In the Eleventh Circuit, the distinctiveness of a trade dress depends

on, among other factors:

> whether it [is] a "common" basic shape or design, whether it [is]
> unique or unusual in a particular field, [and] whether it [is] a
> mere refinement of a commonly-adopted and well-known form of
> ornamentation for a particular class of goods viewed by the
> public as a dress or ornamentation for the goods . . .

AmBrit, 812 F.2d at 1536 (quoting Brooks Shoe Manufacturing Co. v. Suave

Shoe Co., 716 F.2d 854, 858 (11th Cir. 1983)). Trade dress elements are

not examined piecemeal; "it is 'the combination of elements and the total

impression that the dress gives to the observer that should be the focus of a

court's analysis of distinctiveness.'" Carillon Importers Ltd. v. Frank Pesce

Group, Inc., 913 F. Supp. 1559, 1563 (S.D. Fla. 1996) (quoting Paddington

Corp. v. Attiki Importers & Distrib., 996 F.2d 577, 583 (2d Cir. 1993)).

In the instant case, there is nothing unique or unusual about the

interior elements Miller's claims as its trade dress.  Numerous restaurants

have a centrally located bar, two hosts at the host station, an open kitchen,

servers with dark Polo shirts and khaki lower garments, and wood on the walls.[8]  There is also nothing particularly noteworthy about the design or placement of Miller's menu, red restaurant signage, or promotional materials. These interior characteristics, when viewed in combination, are simply too generic to be protectable. See HI Ltd. Partnership v. Winghouse of Florida, Inc., 347 F. Supp. 2d 1256 (M.D. Fla. 2004) (allegedly infringing elements were "far too typical of other restaurants, particularly the sports bar and grill genre, to provide any basis for a finding of infringement"). Miller's claimed trade dress is merely a refinement of the commonly-adopted form of ornamentation for sports bars and casual restaurants. The Court therefore holds, as a matter of law, that Miller's claimed trade dress is not inherently distinctive.

### 2. No Secondary Meaning in Miller's Trade Dress

The secondary meaning attributed to a particular product name or product dress depends on, among other things,

> (1) the length and manner of use; (2) the nature and extent of advertising and promotion; (3) the efforts made by plaintiff to

---

[8] Arguably, a centrally located bar and an open kitchen are, in and of themselves, functional characteristics which cannot be protected as trade dress. See Epic Metals Corp. v. Souliere, 99 F.3d 1034, 1040-42 (11th Cir. 1996) (primarily functional product shape is not protectable). A central bar facilitates serving alcohol products to other parts of a restaurant, and an open kitchen assures diners of the cleanliness of a restaurant's food preparation. As Miller's claims the entire interior appearance of its restaurants as its trade dress, however, the Court examines Miller's interior elements in the aggregate.

promote a conscious connection with the public's mind between
the name and plaintiff's product; and (4) the extent to which the
public actually identifies the name with plaintiff's product.

Vital Pharmaceuticals, Inc. v. American Body Bldg. Products, LLC, 511 F.

Supp. 2d 1303, 1311 (S.D. Fla. 2007) (smooth cylindrical bottle had neither

inherent nor acquired distinctiveness). Even though the interior appearance

of Miller's restaurants lacks inherent distinctiveness, Miller's restaurant

interior might be protectable with a sufficient showing that it had acquired

distinctiveness in the eyes of the public. Bauer Lamp Co., Inc. v. Shaffer,

941 F.2d 1165, 1170 (11th Cir. 1991) ("plaintiff must show that the product

is distinctive or has developed a secondary meaning"). Once again, Miller's

has not presented sufficient evidence to raise a genuine issue of material

fact on this question.

All the evidence Miller's has presented on the question of secondary

meaning relates to the term "ale house."  The Court, however, has already

found that the term "ale house" is generic and unprotectable. Miller's has

provided no evidence showing that its claimed trade dress has acquired

secondary meaning in the eyes of the public. As noted *supra* in the Court's

discussion of Miller's "ALE HOUSE" brand, Miller's has not conducted a

systematic survey of relevant consumers.[9]  Instead, Miller's presents

---

[9] A consumer survey is not required for proving trade dress
infringement, but such a survey is strong evidence of how the general public
view a particular trade dress. See Vital Pharmaceuticals, 511 F. Supp. 2d at
1311 (discussing strength of survey evidence and weakness of isolated

instances of actual confusion in the form of witness testimony and employee-created confusion logbooks. This evidence simply does not support Miller's claim; after examining both the testimony and the logbooks submitted by Miller's, there are no recorded instances where diners associate the interior appearance and decor of Miller's restaurants specifically with Miller's "ALE HOUSE" brand. Without some evidence showing that Miller's presence in the marketplace and efforts at branding its interior have actually been successful, no reasonable jury could conclude that Miller's trade dress has acquired secondary meaning.  Thus, Miller's had failed to raise a genuine issue of material fact relative to this claim.

### 3. Conclusion

Because Miller's trade dress lacks inherent distinctiveness, and because Miller's has not submitted competent evidence to raise a genuine issue of material fact that its restaurant decorations and layout are recognized as trade dress by consumers, the Court holds, as a matter of law, that Miller's restaurant interiors are not protectable trade dress.

### C. False Advertising Claim

Section 1125(a) of Title 15 of the United States Code "is one of the few provisions [of the Lanham Act] that goes beyond trademark protection." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29 (2003).

---

witness accounts).

28

Even without a valid trademark or trade dress, a plaintiff may still have a Lanham Act cause of action for unfair competition when a defendant engages in commercial advertising that makes a false or misleading representation of fact relating to the "nature, characteristics, qualities, or geographic origin" of products or services. Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994) ("Section 1125(a) . . . covers false advertising or description whether or not it involves trademark infringement"). A plaintiff bringing a false advertising claim under § 43(a)(1)(B) of the Lanham Act must show

> (1) the advertisements of the opposing party were false or misleading;(2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been-or is likely to be-injured as a result of the false advertising.

Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1260, (11th Cir. 2004).

In this case, Miller's alleges that BCAH has engaged in false advertising through its coupons. In addition to offering the same type of discount that Miller's coupons have offered in the past, BCAH's coupons state that they are "valid at participating Palm Beach Area locations." Miller's claims that this is a misleading statement intended to deceive consumers and trade on the goodwill of Miller's "ALE HOUSE" restaurants, as BCAH's restaurant is the only Carolina Ale House restaurant in Palm Beach County. BCAH argues that

the coupons are not misleading, as there is a Carolina Ale House location in Weston, Florida (a city in Broward County). Miller's responds that Weston is not part of the "Palm Beach Area."

When evaluating the falsity of an advertisement, "'a court must analyze the message conveyed in full context' and 'must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.'" Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1248 (11th Cir. 2002) (quoting Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 946 (3rd Cir. 1993)). Here, the physical addresses and phone numbers of both Carolina Ale House locations in South Florida are printed prominently by the coupons, accompanied by the "Carolina Ale House" logo and website address. The reference on the coupons to "Palm Beach Area locations" must be viewed in the context of the entire advertisement, which specifically lists the "Carolina Ale House" locations where the coupons are valid. The Court therefore holds that BCAH's coupon is not literally false.

False advertising also encompasses "'claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers.'" Hickson, 357 F.3d at 1261 (quoting United Industries Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998)). As with the claim of literal falsehood, when the entire

30

advertisement is read, including the specific restaurants at which the coupons may be used, the coupons are not misleading.  However, even assuming they could be so construed, a plaintiff attempting to establish this "second kind of falsehood, that an advertisement is literally true but misleading, must 'present evidence of deception' in the form of consumer surveys, market research, expert testimony, or other evidence." Hickson, 357 F.3d at 1261. Again, Miller's has only produced anecdotal evidence that BCAH customers sometimes attempted to use Miller's coupons and vice versa. There is no reliable consumer or market research showing "that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement." Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp., 960 F.2d 294, 298 (2d Cir. 1992). In view of this lack of evidence, the Court holds that Miller's has not raised a genuine issue of material fact that BCAH's coupons are misleading.

Miller's also claims that BCAH has unfairly copied its dining promotions and special events, like Miller's pay-per-view mixed-martial arts "fight nights," in an effort to insinuate that BCAH is a part of Miller's family of restaurants. Even assuming that BCAH intended to copy Miller's specials, BCAH's promotions are not unfair competition as a matter of law. "In general, unless an intellectual property right such as a patent or copyright

protects an item, it will be subject to copying." <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 29 (2001). In advertising its dining specials, BCAH does not claim that it is affiliated with Miller's in any way, and the mere copying of another restaurant's unprotected dining specials and lunch promotions cannot constitute unfair competition. <u>See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.</u>, 489 U.S. 141, 158 (1989) (protection afforded by unfair competition is limited and only extends to the copying of nonfunctional aspects of consumer products that have gained secondary meaning).

Accordingly, the Court holds that no reasonable jury could find that BCAH has engaged in unfair competition as defined by the Lanham Act.

### D. Copyright Infringement Claim

To state a claim for copyright infringement under the Copyright Act, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991). If the plaintiff does not have direct proof of copying, the plaintiff may show copying by demonstrating that the defendants had access to the copyrighted work and that the works are substantially similar. <u>See</u> <u>Benson v. Coca-Cola Co.</u>, 795 F.2d 973, 974 (11th Cir. 1986). To show substantial similarity, the plaintiff must establish that "an average lay observer would recognize the

32

alleged copy as having been appropriated from the copyrighted work."

Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 829

(11th Cir. 1982).

In this case, Miller's claims that BCAH infringed one of Miller's

copyrighted restaurant floor plans, entitled "Ale House Floor Plan Five."

BCAH argues that its floor plan is not substantially similar to Miller's plan.[10]

The Court agrees.[11]

Courts are sometimes reluctant to grant summary judgment in

copyright cases, since assessing the similarities between two works is a

subjective determination typically left to the factfinder. Peel & Co., Inc. v.

Rug Market, 238 F.3d 391, 395 (5th Cir. 2001). Notwithstanding that

concern, however, in the Eleventh Circuit "non-infringement may be

determined as a matter of law on a motion for summary judgment, either

because the similarity between two works concerns only non-copyrightable

---

[10] BCAH contends that issue preclusion bars Miller's from bringing its copyright claim. Miller's is litigating one of the same copyrighted floor plans it presented in Ale House Management, Inc. v. Raleigh Ale House, Inc., 205 F.3d 137 (4th Cir. 2000). The Court of Appeals held that RAHI's floor plan was not substantially similar to any of Miller's plans as a matter of law. Issue preclusion does not apply here, however, as BCAH's floor plan was never examined by the Fourth Circuit, and thus the legal issue at bar is distinct.

[11] BCAH also claims that Miller's has not produced evidence that BCAH accessed Miller's floor plans. Miller's argues that BCAH had access to the floor plans because Lou Moshakos, an owner of BCAH, saw the floor plans in the course of the prior Fourth Circuit case. Because the Court finds, as a matter of law, that the works in question are not substantially similar, the Court does not address the issue of access.

elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Herzog v. Castle Rock Entertainment, 193 F.3d 1241, 1247 (11th Cir. 1999). Summary judgment is particularly appropriate when the substantial similarity determination involves an architectural work that is merely a compilation of common design ideas. Intervest Const., Inc. v. Canterbury Estate Homes, Inc., 554 F.3d 914, 919-20 (11th Cir. 2008).

The Copyright Act's definition of "architectural work" includes "the arrangement and composition of spaces and elements in the design" but excludes "individual standard features," such as windows, doors, and other common architectural features. 17 U.S.C. § 101. Because of this narrow definition, when comparing two architectural floor plans, "modest dissimilarities are more significant than they may be in other types of art works." Howard v. Sterchi, 974 F.2d 1272, 1276 (11th Cir. 1992) (comparing country style frame house floor plans). As there are only so many ways to divide up a rectangle into rooms, "similarities in the general layout of rooms can easily occur innocently." Id.

In this case, Miller's argues that BCAH's floor plan is substantially similar to Miller's "Ale House Floor Plan Five." When viewed at a broad level of generality, the two floor plans are arguably similar. From the perspective of a customer entering each establishment, both floor plans feature

34

restrooms at the rear left and a kitchen on the rear right, a central bar with booth seating on the left side, and "high-top" tables and stools to the right accompanied by pool tables. For the purposes of the copyright infringement analysis, however, the overall plans must be compared at the level of protected expression: a factfinder must be able to determine that BCAH's *arrangement* of these common elements bears a substantial similarity to Miller's floor plan. See Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1228 (11th Cir. 2008) (two buildings contained the same combination of design elements; distinct arrangement of those elements, however, supported summary judgment of non-similarity).

An examination of the two plans reveals numerous differences between each arrangement of design elements. Although both plans contain centrally located bars, for instance, the bars are in different locations relative to each restaurant's entryway; Miller's central bar is on the right while BCAH's is slightly to the left. Much of the interior seating is markedly dissimilar; Miller's has several columns of booth seating to the left of the entryway while BCAH interposes a single column of tables between its booths. BCAH has divided its bathroom entrances from the dining area with a solid wall and Miller's has not. The arrangement of the pool tables and video games inside each restaurant is distinct; Miller's places its pool tables in a column between its tables, while BCAH separates its pool tables from

35

the diners and lines its video games along a wall. The outdoor areas are dramatically different; BCAH has a separate outside corner bar and outside seating that hugs the corner of the building, and Miller's floor plan does not specify any outdoor seating at all.

Even on an element by element basis, much of BCAH's floor plan is distinct from Miller's. Because architectural works are only accorded "thin" protection for their overall arrangement of common elements, the Court finds, as a matter of law, that the differences here are dramatic and overwhelming, and that the similarities between BCAH's layout and Miller's floor plan exist only at a broad conceptual level. Miller's does not have a copyright on the idea of a centrally located bar, booth seating on the side of a restaurant, or restrooms located in the rear. No reasonable jury, properly instructed, could find that the two floor plans are substantially similar at the level of protected expression. Thus, as a matter of law, Miller's cannot show substantial similarity and cannot prove its copyright infringement claim.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (DE 70) is **GRANTED**.

Since all of Miller's federal claims have been disposed of, the Court declines to exercise supplemental jurisdiction over Miller's state law unfair

competition claims. The Court will enter judgment separately.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach

County, Florida, this 5th day of October, 2010.

_____
KENNETH A. MARRA
United States District Judge